## Boyd *v.* State

No. 43533  May 10, 1965  175 So. 2d 132

*Roach & Roach,* McComb; *Mounger & Mounger,* Tyler-town, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

GILLESPIE, J.

Haskel V. Boyd appeals from a conviction of manslaughter.

Defendant shot and killed James White about nine o'clock in the evening of April 25, 1964, in front of the Hi Hat Club in Pike County, Mississippi.

Defendant is a young married man. On Saturday night he went to the Hi Hat Club with J. C. Conerly and Maxie Gardner. There are several versions as to the

acts and statements of the parties between the time defendant and his companions arrived at the Hi Hat Club and the time of the fatal shooting. There was evidence that defendant had been drinking. One of the State's witnesses testified that the first altercation took place in the Hi Hat Club that evening when defendant walked up to a man and "knocked a man out of his chair and jumped on him. . ."

Maxie Gardner also got into a fight and was put out of the club, but was permitted to return upon being told by U. S. Harveston, the operator of the night club, to "behave yourself." Thereafter Gardner got into another fight and Harveston then took him out the front door and delivered him to Officer Herbert Beardan, constable and deputy sheriff, and Officer Stanley Boyd, also a constable and deputy sheriff, who were on the outside of the Hi Hat Club. Gardner was drunk and the officers put him in Beardan's car. A large number of people were in and around the Hi Hat Club and a general fight started on the inside, one of the witnesses stating, "They were fighting from one end of the building to the other."

Just what part, if any, defendant took in this general engagement is not shown, but Harveston and other witnesses testified that he took hold of defendant and led him to the officers who were standing on the outside. None of the witnesses testified to exactly the same version as to what transpired after appellant was delivered to the officers, but there is ample proof to sustain the finding that Officer Beardan told defendant he was under arrest; that defendant replied it would take Beardan "one hundred years to arrest me," and was cursing in a very loud voice. About that time defendant jerked loose from Officer Beardan and then started back toward him; the officer pulled his gun and told him not to come any further. At one point defendant told Beardan to put his pistol back in his pocket before he made him "eat it," and threatened to whip Beardan.

James White, age thirty years, a large man about six feet two inches in height and weighing about 200 pounds, was in the crowd on the outside. He walked up to defendant immediately after the exchange of words between Officer Beardan and defendant. There are several versions as to what the officer stated, what White stated, and what defendant stated immediately before the fight began between White and defendant. Several witnesses stated, in effect, that White asked permission to whip defendant, using obscene words, and several of the witnesses said the officers told White they would not arrest him if he gave defendant ''a beating,'' and that they actually encouraged White in assaulting defendant. But there was ample evidence for the jury to find that the version of Officer Beardan was substantially correct. He stated that White tried to get the defendant to stop cursing but defendant continued to curse, and he permitted White and defendant to walk off without knowing that they were about to start a fight.

All of the witnesses agreed that White and defendant began to spar, and that they sparred around in a circle without hitting a blow. Some of the witnesses testified that appellant struck at White and missed and that White then knocked appellant down, either by hitting him in the face with his fist or holding his hands together and hitting him so as to knock him down; others testified that he kicked him in the groin. At any rate, it is undisputed that after they had sparred around for forty or fifty feet to where some cars were parked, defendant was either knocked or kicked to the ground and was on the ground doubled up and holding his groin with both hands. Most of the witnesses testified that defendant was backing up as they sparred around in a circle before he was knocked to the ground.

It is undisputed that White kicked appellant one or more times while he was on the ground, and defendant indicated by words that he had had enough and told

White to stay in town twenty-four hours and meet him at the Blue and White Grill and they would settle it. White demanded several times that defendant get up and fight, according to some of the witnesses.

About this time, according to the great weight of the evidence, the officers either pulled White back or went between them while defendant was on the ground, and everyone thought the fight was over. Officer Stanley Boyd, who was defendant's uncle, was carrying a .38 Smith and Wesson on his right side, and as he turned his back, defendant arose from the ground, put his shoulder in Officer Boyd's back and shover him six or eight feet, causing him to fall on his hands and knees. Defendant grabbed Officer Boyd's gun and jerked it out of the holster by breaking the strap as the officer fell in a mud hole. There were a great many bystanders and they all started running. Most of the witnesses stated they did not see where White was at that particular time. As soon as defendant got the officer's gun, he ran back a short distance, estimated as much as ten or fifteen feet, turned around, pointed the gun in front of him, and fired one time. The bullet struck White in the left side about three or four inches above the belt, between the third and fourth ribs. It came out the top of his right shoulder. White was seen leaning against a car about ten feet from the front door of the Hi Hat Club, where he fell and died.

Several witnesses testified they did not see White threaten defendant at the time the shot was fired. One witness who saw the whole fight testified that the last time he saw White before the shooting was when White had turned and started back to the club. Officer Beardan said White quit the fight and he did not see him do anything thereafter to threaten defendant before the shot was fired. The closest that any of the witnesses placed White to the defendant at the time the shot was fired was J. C. Conerly, a witness for defendant. He

testified that White raised his fist and started back toward defendant and defendant jumped up, grabbed the officer's pistol, stepped back a couple of steps, and fired, and that White was ten or twelve feet from the defendant at that time. Neither White nor defendant were armed when the fight began. Defendant is a small man, weighing about 145 pounds, and White was a large man as heretofore stated.

We have painstakingly studied this record and are of the opinion that there was ample testimony to justify the jury in finding the defendant guilty of manslaughter. We are unable to say as a matter of law that he was entitled to the directed verdict or that the verdict is against the overwhelming weight of the evidence. Self-defense was the principal issue and the jury was justified in finding against defendant.

Defendant also contends that the instructions granted the State were erroneous in that they were argumentative and consisted of abstractions; that one of them implied malice, and that the State's instructions cut off defendant's right to assert his claim of self-defense. Reading all the instructions together, we find no reversible error. It would serve no useful purpose to set forth the numerous instructions. Defendant received nineteen instructions fully covering every aspect of his theory of self-defense and other matters, and we find no reversible error in the State's instructions.

The defendant assigns as error the action of the trial court in submitting to the jury the issue of murder, and contends that this was error in view of his contention that the evidence did not justify a verdict of murder. This Court has repeatedly held that when one is indicted for murder and convicted of manslaughter he cannot complain of instructions on murder, and this is true even where the evidence did not justify a conviction of murder. Pickert v. State, 234 Miss. 513, 106 So. 2d 681 (1958); Trask v. State, 216 Miss. 557,

62 So. 2d 888 (1953); Crockerham v. State, 202 Miss. 25, 30 So. 2d 417 (1947).

██ ██ The defendant also assigns as error the action of the trial court in refusing to grant his requested instruction appearing at page 41 of the record. The court was fully justified in refusing to grant said instruction because substantially the same theory is contained in defendant's instruction No. 14.

██ ██ Shortly after the shooting someone called Highway Patrolman Lansing, who came to the scene to transport defendant to jail at Magnolia. Defendant was handcuffed and attached to a chain in the back seat of the patrol car. Shortly after he got into the car and without being questioned, he stated, according to Officer Lansing, "I am glad the s. o. b. is dead and I would do it again." Defendant contends that before the trial began defendant's attorneys demanded and secured an order from the trial judge requiring the State to furnish them a list of the witnesses to be used by the State and Patrolman Lansing's name was for some reason omitted. In McDaniel v. State, 191 Miss. 854, 4 So. 2d 355 (1941), we held that in the absence of statutory requirement the State is not bound to furnish defendants the name of State's witnesses; and in Kelly v. State, 239 Miss. 683, 124 So. 2d 840 (1960), it was held that the State is not required to list the names of witnesses for the State on the indictment. In Mattox v. State, 243 Miss. 402, 137 So. 2d 920 (1962), it was held that the grant or refusal of an accused's request for production or inspection of a writing in the possession of the prosecution is discretionary with the trial court. We are of the opinion that under the circumstances no error was committed in admitting the testimony of Officer Lansing.

Defendant predicates error on a bill of exceptions which shows that after the jury retired to consider its verdict, a bailiff reported that the jury wanted to know

if the court would instruct it as to the maximum and minimum penalty for manslaughter. The court instructed the bailiff to advise the jury that the court could not instruct it further. Thereafter, the bailiff again reported to the court stating that the jury requested information as to whether a verdict of guilty of manslaughter could be returned with the jury fixing sentence at the minimum. Whereupon the court again instructed the bailiff to advise the jury that it could not further instruct it.

Defendant contends that in view of the aforesaid request by the jury that the trial court erred in sentencing him to serve twelve years in the penitentiary. It is settled in this State that it is the trial court's responsibility to mete out the punishment within the limits fixed by the statute. We find no reason to hold that this Court should reverse because of the request made by the jury with reference to punishment. It is true that twelve years is a lengthy sentence but it is well within the limits fixed by the statute, and we do not know what factors the trial court may have taken into consideration in addition to the facts revealed by the record of the trial. We therefore hold that the sentence meted out by the trial court under the circumstances did not constitute reversible error.

Several other assignments of error were made and each has been given careful consideration. Upon an examination of the entire record and the briefs, we are unable to find that the trial court committed reversible error. The judgment is therefore affirmed.

Affirmed.

*Lee, C. J., and Ethridge, Patterson and Inzer, JJ.,* concur.