329 So.2d 67 (1976)
Homer Wayne BARRETT
v.
STATE of Mississippi.
No. 48833.
Supreme Court of Mississippi.
March 16, 1976.
Rehearing Denied April 13, 1976.
*68 Self, Bailey & Jordan, Meridian, for appellant.
A.F. Summer, Atty. Gen. by Wayne Snuggs, Special Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, ROBERTSON and SUGG, JJ.
PATTERSON, Presiding Justice.
Homer Wayne Barrett was indicted and tried for the murder of Bill McCraw by the Circuit Court of Lauderdale County. He was convicted of manslaughter and sentenced to ten years in the state penitentiary. He argues for reversal by this Court (1) the verdict of the jury was against the overwhelming weight of the evidence, (2) the trial court erred in permitting witness Jay Sutton to testify, and (3) the trial court erred in not permitting the introduction of photographs into evidence. We affirm.
On the night of November 28, 1973, George Brantley and Slay Boswell were shooting pool and drinking beer in the Pizza King in Meridian, Mississippi. Shortly before midnight they were joined by Ken Carmichael and Bill McCraw. Carmichael and McCraw had been drinking whiskey and beer and were described as being "fairly drunk." Brantley was characterized as "fairly sober" and Boswell "not as drunk as Bill and Ken."
When the Pizza King closed at midnight, the four young men repaired to the adjacent parking lot where they loitered while discussing what to do next. A few minutes later a silver 1968 or 1969 Chevrolet automobile with a black top pulled into the parking lot. A man, whose identity was unknown, exited the automobile and was told by one of the young men that the restaurant was closed for the evening. The man tried the door anyway, found it locked, and as he returned to his automobile one of the young men addressed an obscenity to him; whereupon the stranger turned around, pulled a pistol from his coat and walked toward Brantley.
Brantley told him that he had not said anything, but nevertheless he was struck on the head with the butt of a pistol, causing the weapon to discharge. Immediately thereafter, when he realized that he was bleeding from the pistol blow, Brantley called the stranger a "son-of-a-bitch," whereupon the pistol was pointed toward Brantley's stomach and fired a second time, the bullet grazing his skin. As he departed to his automobile, the assailant fired twice over his shoulder, wounding Carmichael and killing McCraw.
Boswell, Brantley and Officer Sutton, who was on patrol nearby, testified that four shots were fired. Carmichael, though he told of each shot that was fired, testified on cross-examination he could not recall the number of times the pistol was fired.
Barrett's defense was an alibi. By his testimony and his witnesses he placed himself in his home or his next door neighbor's, some eight miles from the parking lot of the Pizza King, when the fatal shot was fired.
The details of the incident are undisputed. The alibi was controverted and was the primary issue in the trial court as it is in this Court.
Brantley, who was struck on the head and shot in the somach by the person who killed McCraw, came face to face with this assailant in the parking lot. He testified *69 the appellant was the person who struck him and shot McCraw. He explained the identification was possible because the area was illuminated by a street light about forty-five yards from the scene. It should be recalled that Brantley was characterized as being "fairly sober" at the time of the fracas.
Brantley's identification of the appellant was corroborated by other testimony. On the night of November 21, 1973, Theodore Aniel, a Navy petty officer and parttime private detective, met Barrett, an acquaintance, at the wrestling matches in Meridian and purchased from him a .38-caliber "Charter Arms" pistol, Serial No. 172389, for $50.
On November 26 as the result of a conversation with an FBI agent, Aniel handed the pistol to Jim Roberts, a special agent with the Alcohol, Tobacco & Firearms Division, for inspection. After conferring with Roberts, whose interest was the identification and recovery of stolen firearms, Aniel stopped payment on his check for the purchase of the pistol and advised Barrett that it would be returned. In the meantime Roberts inspected and photographed the weapon. He concluded it was then new since it had no powder burns or pit marks on it.
At approximately 8:30 p.m. on November 28, while again at the wrestling matches, Aniel returned the pistol to Barrett and received in turn his check therefor. On November 29 Detective Flaherty of the Meridian Police Department received a copper jacket from a .38-caliber bullet which had been removed from McCraw's body. Thereafter Aniel again had conversation with Roberts, the treasury agent, who was still concerned with stolen weapons and it was decided that Aniel should attempt to purchase other weapons from Barrett. To this end Aniel contacted Barrett who was willing to sell the .38-caliber pistol which had previously been returned to him.
On December 12 Aniel and William Turner, another agent of the Alcohol, Tobacco & Firearms Division, met Barrett at the wrestling matches where the pistol was repurchased by Aniel with funds supplied by Turner. It was later examined by Turner and Roberts who discovered that since the previous examination of the weapon it had been fired from four of its five revolving chambers. From this chronology of events the pistol was given to Detective Flaherty of the Meridian Police Department.
Detective Flaherty brought the pistol and the copper jacket to John Dial, a criminalist in firearms evidence with the Mississippi Crime Laboratory. It was Dial's testimony from microscopic examination of the projectile and comparison with other projectiles from the gun that the copper jacket removed from McCraw's body was fired from the pistol purchased from Barrett. Paul McDonald, a ballistics expert with the Arkansas State Police, examined the copper jacket and the pistol and came to the same conclusion as Dial.
Mrs. Lou Aniel, wife of Petty Officer Aniel, was an employee at the concession stand on the evenings of the wrestling matches. She was acquainted with Barrett who on occasion assisted her at the concession stand. She testified that Barrett, when asked by her where he had been on the night of November 28 following the wrestling matches, replied that he had bought a fifth and had picked up a girl. He also stated, according to Mrs. Aniel, that he and the girl drove around in her car. The girl got drunk and passed out and he got home at 2:00 the following morning.
The state's case depended upon Brantley's identification of Barrett, the connection of Barrett to the pistol, the connection of the projectile removed from McCraw's body to the pistol, as well as the opportunity for Barrett to have been at the Pizza King parking lot when the shooting occurred.
*70 Barrett's defense, as mentioned, was an alibi. In defense he testified that he left the wrestling matches at approximately 10:00 p.m. on November 28 after helping Mrs. Aniel close the concession stand. He stated his mother had attended the matches with him and that he first carried her home and then picked up his wife and children at his mother-in-law's and arrived at his home at about 10:30 that evening. He went then to Jim Bennett's home, which was next door, to deliver a pair of boots and that he, Bennett, and Bennett's wife conversed until about 12:15 when he again returned to his home.
Jimmy Bennett and his wife corroborated Barrett's presence in their home as well as the time he visited. They recalled the clothing worn by the appellant on the occasion which varied from the testimony of the young men who viewed the assailant in the parking lot.
The appellant's mother corroborated her son's testimony as to her associations with him on the night of November 28.
The appellant's wife testified that her husband left her and the children at her mother's home when he attended the wrestling matches. She stated he returned between 10:15 and 10:30 p.m. on November 28 and they drove directly to their home. When they arrived, the lights were on in the Bennett house and her husband went over to deliver a pair of boots which he had purchased for Bennett. She was emphatic that her husband returned home at approximately 12:25 or 12:30 and recalled the time with particularity by connecting it with a movie she was observing on TV.
The witnesses above gave evidence that appellant's automobile was a red Ford with a white top. They stated they had never seen Barrett in a gray and black Chevrolet Impala automobile. However, there is evidence that Barrett's sister owned a gray and black automobile which was sometimes repaired by Barrett and on these occasions driven by him. There is no evidence to indicate that he drove his sister's car on the evening of November 28.
Philip Kean testified that he was a contributing newspaper artist and cartoonist with the Meridian Star. He stated that he drew a composite picture of the assailant from a description given by a young man known as Boswell and that to the best of his recollection George Brantley was unable to give him anything by way of description that he could use for a composite drawing.
McNair Perry, a ballistics and weapons expert of the Federal Bureau of Investigation, testified for the appellant. He stated that the pistol and copper jacket were submitted to him for examination by the Meridian Police Department and from his tests he could not conclude whether the bullet was or was not fired from the pistol. He stated there were insufficient marks on the copper jacket to match or identify it one way or the other as having been fired from the weapon accompanying it.
Several witnesses gave testimony to the appellant's good reputation for veracity and to his general reputation for peace in the community in which he resided.
Since the first assignment of error is that the verdict was against the overwhelming weight of the evidence, we have set out the testimony in some detail. It reflects the awesome duty of a jury to decide the fate of a defendant by resolving conflicting testimony. This resolution, however, is the basis of our criminal court system and is justified by the compelling theory that a jury of one's peers, knowledgeable on everyday facts of life and most aware of community prejudices or lack thereof, is best able to determine the truth from conflicting testimony emanating from the lips of witnesses.
Our studied review of the testimony leads us to the conclusion there was sufficient evidence to support the verdict of the jury and we cannot state that it should have rejected the state's evidence and accepted *71 that favorable to the theory of an alibi. To do so would invade the distinct province of the jury. Spikes v. State, 302 So.2d 250 (Miss. 1974); Ladnier v. State, 273 So.2d 169 (Miss. 1973); and Newton v. State, 229 Miss. 267, 90 So.2d 375 (1956).
The appellant contends next that Patrolman Sutton should not have been permitted to testify since he was not included on the state's list of witnesses which the court had directed to have been made available to the defendant. It is true that his name does not appear, but it is also true that Sutton's proximity to the Pizza King was noted in the report of another officer given to the appellant. The use of Sutton as a witness was largely within the trial court's discretion. McCraw v. State, 260 So.2d 457 (Miss. 1972); and Boyd v. State, 253 Miss. 98, 175 So.2d 132 (1965). We are of the opinion the court did not abuse its discretion in permitting Sutton to testify. His testimony at most corroborated the number of shots that were fired which had been established by other witnesses.
The final point for reversal is that the court erred in not permitting into evidence photographs of a male person standing near a gray Chevrolet automobile. They are explained by Detective Flaherty as having been obtained during the course of his investigation of the crime. While so engaged he obtained information that two men from the state of Michigan were in the area at the time McCraw was killed and that they had been stopped by a police officer for investigation of driving under the influence of alcohol. The photographs were obtained from officers in the state of Michigan and Flaherty was unable to verify them in any manner. However, the objection is again directed to an order of the trial court ordering the state to divulge to the defendant the exhibits it proposed to use during trial. From this the argument is made that the state had withheld the photographs in violation of the court's order and thereby, in some manner, prejudiced the defendant. We discern nothing to indicate the photographs were deliberately withheld from the defendant, but conclude they were part of the investigation and came into question only due to the vagaries of trial. Indeed, we perceive no prejudice emanating from their rejection and again are of the opinion the question was largely within the judicial discretion of the trial court. McCraw, supra, and Boyd, supra.
The record has received much study by this Court. It reflects two versions of fact, one leading to imprisonment for the commission of a felony, the other to an acquittal by way of innocence. The jury by its verdict accepted the former and it is supported by the evidence. There being no prejudicial error revealed by the record, we conclude, as we think we must, that the cause must be affirmed.
AFFIRMED.
GILLESPIE, C.J., INZER, P.J., and SMITH, ROBERTSON, SUGG, WALKER and BROOM, JJ., concur.