357 So.2d 292 (1978)
Robert L. GROOMS, Jr.
v.
STATE of Mississippi.
No. 50339.
Supreme Court of Mississippi.
March 29, 1978.
Rehearing Denied April 26, 1978.
Cunningham, Smith & Ferrell, John A. Ferrell, Booneville, for appellant.
A.F. Summer, Atty. Gen. by Catherine W. Underwood, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, BROOM and BOWLING, JJ.
BOWLING, Justice, for the Court:
Robert L. Grooms, Jr., was indicted, tried and convicted in the Circuit Court of Prentiss County for the crime of murder. The lower court sentenced him to serve a life term under the jurisdiction of the Mississippi Department of Corrections. We affirm.
Appellant presents two assignments of error, to wit: (1) The trial court erred in failing to grant appellant a new trial as the verdict was contrary to the law and facts *293 and against the overwhelming weight of the credible evidence, and (2) the trial court erred in allowing the testimony of Mrs. Crystal Smith relative to prior threats made against the deceased by the appellant. Due to the alleged error contending the verdict to be against the overwhelming weight of the credible evidence, it is necessary to discuss that evidence briefly.
On the night of September 3, 1976, the deceased, William Ervin (Jack) Smith was struck on the head. He died on September 10, 1976, from this injury. Appellant, Robert L. Grooms, Jr., and witness J.L. Essary, each claims that the blow was struck by the other.
Essary was the first witness for the State. He testified that on the afternoon of September 2, 1976, he and appellant went from Booneville to Baldwyn around noon and stayed until nearly four o'clock P.M. During that period of time he and appellant drank about four beers. They returned to Booneville but left that city around 6:30 P.M., after taking Essary's family to spend the night at the Grooms residence. According to Essary, he and Grooms stayed and visited in Baldwyn until around 11:15 or 11:45 P.M., during which time they partook of further alcoholic beverages. He testified that after they left Baldwyn, Grooms suggested going by the home of his father-in-law, Jack Smith, who lived out in the country near Jumpertown, and they arrived there around one o'clock A.M. Smith lived in a very small house and after waking Smith, the three talked for a time. According to Essary, Grooms then went outside and called him and told him he was going to kill Smith. Essary thought he was kidding and went back inside. Grooms then, according to Essary, came into the room with a piece of pipe and after distracting Smith's attention to another part of the room, he struck Smith over the head with the pipe. Grooms then ran out the door and Essary caught up with him and they got in the car and went back to Booneville. On the way, Grooms told Essary to throw the pipe out the window, which he did.
Grooms and Essary then went to the Grooms' residence where, according to Essary, Grooms told his wife that he had hit her father and thought he had killed him. The two of them, that is, Grooms and his wife, decided to go to the Smith residence and check on her father. Essary stated he later learned that Smith was in a hospital in Tupelo. He further testified that Grooms told him that he would kill him if he said anything about the incident. Essary testified that he went to the office of the sheriff on Sunday night, September 5, after hearing that Smith was "going to die." He testified that he then told the sheriff and his deputies what had occurred.
Pam Essary, J.L. Essary's wife, testified that she was spending the night of September 2 in the Grooms' residence; that Grooms and J.L. came to the Grooms' house about two or three o'clock the next morning, and she heard Grooms tell his wife Kay that he had hit her father on the head and was afraid he was dead. Grooms said they should go back and if Smith was not dead he should finish killing him. Grooms and Essary went to get gasoline and she went to bed. The next day Grooms told her that his father-in-law was still alive. She testified that the night J.L. told the sheriff about the incident Grooms came by the house and threatened her if she told anyone what he had done.
Witness Wren lived near the deceased. He testified that about seven o'clock A.M., on September 3, Grooms and his wife called the sheriff's office from Wren's house. We went to the Smith home and found him unconscious on the bed with blood on his pillow.
Deputy Sheriff Anderson testified about talking with Essary and about searching for the death weapon with Essary. It was not found that day but was later found and marked. Anderson was sure he had found the instrument on September 4.
Dr. Forrest Tutor, a neurosurgeon, testified about Smith's injuries; that Smith had died from a blood clot on his brain resulting from a blow to his head.
*294 Sheriff Martin testified that he and Deputy Anderson found the pipe and that Grooms was arrested on Monday or Tuesday following the incident but he did not make a statement at that time. He testified on cross-examination that later Grooms told him "I did not do it." He admitted that it was J.L. Essary's information that led to the arrest of appellant.
Appellant testified in his own defense. He stated that he did not see J.L. Essary on September 2, 1976, until around five o'clock P.M. The two of them went to Baldwyn to the Bavarian Inn and then to Lee-Ann's Restaurant, where they stayed until 11:45 P.M. He testified they purchased a half case of beer and then rode around. They ended up at the house of his father-in-law, Jack Smith. Grooms testified that he went outside the house and Essary followed him and told him he was going to knock Smith in the head and take his money. Grooms said he thought it was a joke, the same as Essary had previously testified about the alleged statement of Grooms. Appellant testified that Essary went back in the house and that a "thump" was heard and he saw Jack Smith leaning back in the bed. The next thing he knew he was walking down the road, and the reason for so doing was because he was scared. He testified that he was looking out the door and did not see Essary hit Smith. He testified that Essary told him he was going to hit Smith and begged him not to tell anyone.
When he arrived at his home in Booneville, Essary's wife let them in and then she went back to bed. Appellant then testified that he told his wife that her father had been hit but she did not believe him. Essary then said, according to appellant, that he had just as soon go back and make sure the job was finished. The two of them went and got some gas in the car and the three, Grooms, his wife, and Essary, started back toward the Smith house, but on the way they met a hearse and thinking that it contained Smith, they turned around and went back home. The next morning, according to appellant, he and his wife went to the Smith house and found him on the bed unconscious. They "cleaned him up" and went next door and called the sheriff. Grooms testified that he loved his father-in-law "like my own daddy" and would not kill him.
Appellant's wife, Kay Grooms, testified that when Grooms and Essary came in on the night in question, her husband told her that her father had been hurt and they needed to go check on him. She heard Essary say he would go finish the job. She testified that they started to the Smith house that night but did not go all the way because they met a hearse on the road. The next morning she and appellant went to her father's house and found him unconscious. She testified that appellant never said he had hit her father but told her it was Essary that hit him. She testified that she did not talk to the sheriff about the matter until about a week after her husband had been arrested because she thought her father would live and could eventually tell that Essary was the one who had hit him.
Chester Ward, Chief of Police of Baldwyn, with fourteen years of law enforcement experience, testified that he knew J.L. Essary and his reputation in the community for truth and veracity was bad.
Jackie Hamblin testified that around four o'clock A.M., on September 3, the appellant came to his house to borrow some gas. Grooms told him then that Essary had hit Smith and that they were going to see about him. He further testified that Essary was not present when Grooms told him about the incident.
In rebuttal, the State first offered Geneva Edge, the sister of witness Hamblin. She testified that Hamblin told her that on the night of the incident Grooms and Essary came to his house and Grooms told him he was afraid he had killed Smith.
Ray Smith, son of the deceased and brother of Kay Grooms, testified that Kay talked with him the day after their father underwent an operation; that she told him she knew her husband had killed their father, but she could not testify against him as he would kill her.
*295 Crystal Smith, wife of Ray Smith, testified that a week or a week and a half before September 3, 1976, she saw Grooms and he told her that he was going to kill Jack Smith or "whip his ass and the better man would win." She testified they were just sitting around talking when Grooms made that statement.

ASSIGNMENT OF ERROR NO. 1
Was the verdict of the jury contrary to the law and facts and against the overwhelming weight of the credible evidence?
From the foregoing discussion, it is clear that the testimony was in direct conflict. Grooms and Essary each stated the other struck Smith. The testimony of other witnesses was conflicting as to what each later related about the occurrence. This Court has held in a number of cases similar to this case that such conflicting evidence is for the jury to resolve. As stated in Barrett v. State, 329 So.2d 67 (Miss. 1976), this Court recognized the awesome duty of the jury but adhered to the principle that the jury who observes the witnesses and hears the evidence is best able to determine the truth and credibility of the witnesses. In the case of Murphree v. State, 228 So.2d 599 (Miss. 1969), the Court said:
Appellant contends that the trial court erred in refusing to grant the appellant a peremptory instruction and in overruling a motion for a new trial. The motions were properly overruled because the evidence was conflicting and the jury is the sole judge of the credibility of witnesses and the weight and worth of their testimony. This wise rule applies with equal force to the State's witnesses as to the appellant's witnesses, including the appellant. We have repeatedly held that jurors may accept the testimony of some witnesses and refuse that of others, and that they may accept in part and reject in part the evidence on behalf of the State and on behalf of the accused. McLelland v. State, 204 So.2d 158 (Miss. 1967); Cobb v. State, 235 Miss. 57, 108 So.2d 719 (1959); Ivey v. State, 206 Miss. 734, 40 So.2d 609 (1949); Hill v. State, 199 Miss. 254, 24 So.2d 737 (1946). It is not for this Court to pass upon the credibility of witnesses, and where the evidence justifies the verdict it must be accepted as having been found worthy of belief. McLelland v. State, supra; Matthews v. State, 243 Miss. 568, 139 So.2d 386 (1962); Scott v. State, 185 Miss. 454, 188 So. 546 (1939). It is obvious that this Court cannot set aside a verdict of guilty unless it is clear that the verdict is the result of bias, passion or prejudice or is manifestly against the overwhelming weight of the credible evidence. McLelland v. State, supra; Marr v. State, 248 Miss. 281, 159 So.2d 167 (1963); Henderson v. State, 187 Miss. 166, 192 So. 495 (1939). Furthermore, all the proof need not be direct and the jury may draw any reasonable inferences from the evidence in the case. McLelland v. State, supra; Woodward v. State, 180 Miss. 571, 177 So. 531, 178 So. 469 (1938).
We are forced to the conclusion that the jury had ample evidence to find that appellant was the person who struck Smith on the head with the pipe. We cannot say with any degree of certainty that the finding of the jury was against the overwhelming weight of the evidence.

ASSIGNMENT OF ERROR NO. 2
Did the court err in permitting witness Crystal Smith to testify that a week or a week and a half before September 3 she had heard appellant threaten to kill Jack Smith?
We have held in several cases that threats made by an accused to kill the deceased uncommunicated to the deceased are admissible in evidence. These threats show malice, premeditation or criminal intent. Herron v. State, Miss., 287 So.2d 759, cert. denied 417 U.S. 972, 94 S.Ct. 3179, 41 L.Ed.2d 1144 (1974); Ladner v. State, 197 So.2d 257 (Miss. 1967); Lambert v. State, 171 Miss. 474, 158 So. 139 (1934); Myers v. State, 167 Miss. 76, 147 So. 308 (1933). We further have held that should the alleged threat be so remote as to be of no evidentiary *296 value it should not be admissible. Myers v. State, supra. In Sharplin v. State, 330 So.2d 591 (Miss. 1976), we held that the trial judge did not abuse his discretion in allowing evidence of a conditional threat made by the accused two months before the killing of the deceased. Whether or not a threat is too remote to be admissible is a question addressed to the sound discretion of the trial judge. We hold that the lower court was completely within its discretion in holding that the alleged threat made in the presence of witness Crystal Smith was admissible.
We can find no reversible error in the record in this case.
AFFIRMED.
PATTERSON, C.J., SMITH, and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and COFER, JJ., concur.