# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01286-COA

**DARNELL STEVENSON**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/19/2021 |
| TRIAL JUDGE: | HON. DEBRA W. BLACKWELL |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ZAKIA HELEN ANNYCE BUTLER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA RODU ROSENBLATT |
| DISTRICT ATTORNEY: | SHAMECA SHANTE' COLLINS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/27/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Darnell Stevenson was indicted on charges of first-degree murder, two counts of aggravated assault, and drive-by shooting with firearm enhancements. After a trial, a jury found him guilty of the lesser-included offense of second-degree murder (Count I), two counts of aggravated assault (Count II & III), and drive-by shooting (Count IV) with firearm enhancements. Stevenson now appeals and claims that the testimony of an accomplice to the crimes was "unreasonable, self-contradictory, and substantially impeached" and that the evidence was insufficient to support his convictions. Finding no error, we affirm.

**FACTS**

¶2. Officers with the Natchez Police Department responded to a drive-by shooting that occurred at the Holiday Apartments in September 2018. The shooting occurred at approximately 2:19 a.m. Joshua Beamer, Alisha Mason, and Lewis Jackson were victims of the drive-by shooting. At the time of the shooting, Beamer and Mason were inside their apartment, and Jackson was standing outside his apartment building.

¶3. At the scene of the crime, Jackson was able to give the responding officers a description of the vehicle involved before he died from the injuries he sustained. Beamer and Mason also gave a description of the vehicle. The victims described the vehicle as a gold SUV. The day after the shooting, police officers discovered the gold SUV at a residence where Darnell Stevenson and Darryl Hurts were residing. The police investigation identified Jamien Washington as the owner of the gold SUV. Stevenson, Hurts, and Washington were arrested and charged with the murder of Jackson, the aggravated assault of Beamer and Mason, and drive-by shooting.

¶4. Stevenson was indicted on March 12, 2020, for first-degree murder (Miss. Code Ann. § 97-3-19(l)(a) (Supp. 2017)), two counts of aggravated assault (Miss. Code Ann. § 97-3-7(2)(a)(ii) (Supp. 2016)), and drive-by shooting (Miss. Code Ann. § 97-3-109 (Rev. 2014)) with firearm enhancements pursuant to Miss. Code Ann. § 97-37-37(1) (Rev. 2014). On November 6, 2020, Stanley Alexander, an attorney for the State, emailed Stevenson's attorneys the following: "On yesterday, Mr. Hurts entered an open plea to the charge of Conspiracy to commit 2nd Degree Murder. In exchange for the reduced charge, Mr. Hurts

2

agreed to testify against defendants Stevenson and Washington."[1] Stevenson's trial started on October 12, 2021.

¶5. At trial, Commander Scott Frye of the Natchez Police Department was the first to testify. Frye testified that he was responding to a call regarding a gunshot victim when "Sergeant Ford . . . called me . . . and said the suspect's vehicle, gold SUV, was possibly at Holiday Apartments." Frye testified that he proceeded to the location in an unmarked vehicle, and when he "was about to call in the tag, all of a sudden, gunfire started coming out of the driver's window, and it was hitting the truck next to me and the glass." He explained that he thought "they were shooting at me," so he put his car in reverse and "started backing up to get out of the kill zone." Frye explained that he yelled "[S]hots fired, shots fired," so he could have "backup" at the scene. Frye stated that he did not see anybody at the time of the gunfire. Frye testified that Sergeant Felesha Fleming and Officer Hannah Best Willis[2] provided backup a few minutes later.[3] All the officers returned to the crime scene where they discovered a white truck "shot up" and Jackson, the gunshot victim. Frye identified the white truck as the truck he was "parked next to or stopped next to" during the gunfire.

¶6. Frye also testified that law enforcement recovered a .40-caliber shell casing from the

---

[1] Alexander's email also contained the "proffered testimony" that Hurts made during his plea.

[2] Officer Hannah Best married between the time of the incident and the trial of this cause. She introduced herself as "Hannah Willis" to the jury. Since the trial transcript refers to her maiden name "Hannah Best," we too will use her maiden name in this opinion.

[3] Frye also stated that he did not see anybody jump out of the vehicle because he "was backing up, getting out of the kill zone. At that point my priority was to get out of the kill zone."

3

gold SUV. He said the casing was recovered from a green Crown Royal bag that was "hanging from the steering column." He also testified that "numerous" rounds of .223-caliber casings were found inside the vehicle from "the back cargo area" and also on the street of the crime scene. He explained that the .223-caliber shell casings were "scattered" inside the vehicle and "on the roadway" of the crime scene. He stated that assault rifles shoot .223-caliber bullets.

¶7.     During cross-examination, Frye testified that he conducted interviews with Washington and Hurts, and initially Hurts stated "he did not have any role in the crime." Frye also testified that he did not recover any DNA or fingerprints from the gold SUV that belonged to Stevenson. He stated, "The only DNA we got from the SUV was the blood, and it was Jamien Washington." Frye also testified that he did not see anyone shooting back at the gold SUV, but he explained that the photographs of the vehicle with bullet holes indicated "somebody on the far side was shooting at the SUV." He explained, "[T]he evidence tells me that they were – the shooting . . . towards Mr. Jackson was coming from the vehicle, and there was someone had fired some shots at the SUV on the other side." He also explained that the .223-caliber shell casings recovered from the roadway and inside the gold SUV indicated that the shooter fired the assault rifle while inside and outside of the vehicle.

¶8.     Juan McDonald also testified for the State. At the time of the shooting, McDonald was an investigator with the Natchez Police Department. He testified that he interviewed Jamien Washington and spoke to the victims Mason and Jackson at the hospital. McDonald

4

explained that he spoke with Jackson "prior to him expiring" and that Jackson gave him a description of the vehicle involved in the shooting. McDonald said Jackson described the vehicle as "a khaki Tahoe with rims." McDonald also testified that blood evidence was found "by the driver's seat" inside the gold SUV. He said the crime lab "match[ed]" the blood recovered from the gold SUV to Washington.

¶9. Officer Best testified that she responded to Commander Frye's call for "backup" and went to the Holiday Apartments. Best testified she "observed a black male [l]ying on the ground in front of building 23." She explained that the victim had been shot in his back, but he was able to give a description of the vehicle involved in the shooting. She testified that the victim told her it was "a gold Tahoe with rims." She identified Jackson as the victim.

¶10. Stevenson's cousin Darryl Hurts was called as a witness for the State. Hurts was originally arrested and charged with first-degree murder, but he pleaded guilty to the lesser offense of accessory before the fact to second-degree murder. Hurts described his relationship with Stevenson as "real close," and he said that they lived together. He testified that before the shooting occurred, he "had got off work from being in BR hot shotting and Jamien Washington called me . . . [and] I met up with Jamien, Darnell, and Ashanta and India, and we went to town" and dropped India's car off at Walmart. Hurts said that they rode around and got some Xanax "bars," and then they dropped India and Ashanta back off at Walmart. He said that he did not take any "bars" and that the "bars" were for Stevenson and Washington.

¶11. Hurts also testified that they went to a store called Zipy's before the shooting

occurred. He said, "[W]e were just chilling around, and then that's when the police pulled up and told us to move around." He said they were in Washington's truck, and described it as a "gold Tahoe or something like that." Hurts said that after the police told them to "move around," they "moved around" and started "blocking." Hurts explained that "blocking" meant "ride through the city." He said that was when they "came out to the Heights and went to the Oaks . . . and we bust off in [the apartments] and made another block." He testified that Washington was driving and that Stevenson told Washington to "hit another block" because he was "trying to see something drop." Hurts said that "see something drop" meant "see somebody get killed." He explained that Stevenson wanted to go to the Holiday Apartments because "a couple of weeks ago" a "shooting had occurred" in Stevenson's neighborhood, and that Stevenson suspected a person named Jay Luc. Hurts said the Holiday Apartments was an area that Jay Luc "hung out."

¶12. Hurts testified that Washington had a "40 and Darnell had a 223[;] A[n] AR. Assault rifle." He said that they made another block, and "that's when Rosta – [Washington] was like there he go . . . that's when the shots went off." He said "[Washington] started shooting. Darnell started shooting, and shots started coming from the back hitting the back of the truck, and pulled off and that's when his truck started getting shot up, and that's when Darnell jumped out shooting [the assault rifle]." He said, "[T]hey were just shooting." Hurts testified that Stevenson was sitting in the back and that he was seated "on the passenger's side," front seat. Hurts explained that he "ducked" under the dashboard when Washington and Stevenson started shooting. Hurts testified that Washington received injuries to his arm.

6

He said Washington was bleeding, and there was "glass in his arm."

¶13.    Hurts also testified that they (he and Washington) left the apartments without Stevenson.    Hurts said they "got back in touch with [Stevenson] in the Heights."    He explained that Stevenson called them and told them where to pick him up.    Hurts "guess[ed]" that Stevenson left the apartments "through the bayou."   Hurts said that "me, [Washington], and India" picked up Stevenson, and they took him to Broadmoor.    He also said, "[M]e, [Washington], and India took [Washington's car] to my daddy house."

¶14.    During cross-examination, Hurts admitted that he originally told Officer Frye that he had nothing to do with the shooting and that his original statement was a lie.    Hurts was also confronted with a photograph that showed him sitting in the backseat of the SUV holding the assault rifle on the night of the shooting.   The photograph was time-stamped, September 22, 2018, at 12:10 a.m.[4]   Hurts explained that "plenty of pictures [were taken] that night." During redirect examination, Hurts further explained that "everybody [was] taking pictures with [the assault rifle]," and that the rifle belonged to Stevenson.    Hurts also said that Washington took a picture with the rifle too.

¶15.    The State called Starks Hathcock to testify as a "forensic scientist specializing in firearms identification."   He testified that he recovered thirty-two .223-caliber shell casings and five .40-caliber shell casings from the crime scene.   He explained that he was able to identify twenty-four of the .223-caliber shell casings "as having been fired from the same gun" and all five .40-caliber shell casings were fired from the same gun.    Hathcock testified

_____

[4] Officer Frye testified before Hurts and said the actual shooting occurred at 2:19 a.m.

7

that he analyzed a fragment of a projectile lodged in Jackson's back, and he identified it as part of a .223-caliber bullet.

¶16.  Following the presentation of evidence, defense counsel moved ore tenus for a directed verdict, which the court denied.  The jury returned verdicts finding Stevenson not guilty of first-degree murder but guilty of the lesser-included offense of second-degree murder (Count I), two counts of aggravated assault (Count II & III), and drive-by shooting (Count IV) with firearm enhancements for Counts II–IV.

¶17.  On October 19, 2021, the trial court sentenced Stevenson to serve forty years for second-degree murder (Count I), two twenty-year terms for aggravated assault (Counts II & III), and thirty years for drive-by shooting (Count IV), with each term to run concurrently in the custody of Mississippi Department of Corrections (MDOC).  In addition, pursuant to Mississippi Code Annotated section 97-37-37(2), the trial court imposed the "mandatory enhancement" and sentenced Stevenson to serve an additional ten years for the convictions of Counts II, III, and IV in the custody of the MDOC.  The enhancement terms were ordered to run consecutively to the sentences for Counts II–IV and consecutively to each other.

¶18.  On November 10, 2021, Stevenson filed a motion for a new trial on the basis that "the State was allowed to produce evidence but failed to show a proper chain of custody."  On November 19, 2021, the Adams County Circuit Court entered an order denying Stevenson's motion for a new trial.  Stevenson now appeals.

¶19.  On appeal, Stevenson raises the following issue: the trial court erred in denying his motion for a directed verdict "where no credible evidence placed [him] at the scene of the

8

incident." Stevenson argues the evidence presented at trial was insufficient to support his conviction. He further claims the jury's guilty verdicts rested solely on uncorroborated accomplice testimony that was "unreasonable, self-contradictory, and substantially impeached," and he requests this Court to "reverse his conviction and render a judgment of acquittal in his favor."

## STANDARD OF REVIEW

¶20. Motions for directed verdict challenge the sufficiency of the evidence presented at trial. *Lacey v. State*, 310 So. 3d 1206, 1214 (¶18) (Miss. Ct. App. 2020). The appellate court reviews challenges to the sufficiency of the evidence de novo. *Id.* (citing *Jerninghan v. State*, 910 So. 2d 748, 751 (¶6) (Miss. Ct. App. 2005)). This Court "will reverse the denial of a directed verdict only where reasonable and fair-minded jurors could only find for the moving party." *Id.* The State is "given the benefit of all favorable inferences that can be reasonably drawn from the evidence." *Lacey*, 310 So. 3d at 1214 (¶18); *accord Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). This Court "is not at liberty to direct that the defendant be found not guilty unless . . . no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty." *Id.*

¶21. Under this review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Grossley v. State*, 127 So. 3d 1143, 1147 (¶10) (Miss. Ct. App. 2013); *see also Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018) (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)). If the

9

court finds that "any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the [State], the verdict must stand." *Smith v. State*, 250 So. 3d 421, 424 (¶12) (Miss. 2018) (quoting *Cowart v. State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015)).

¶22.    Motions for a new trial fall within a lower standard of review than motions for a directed verdict. *Lacey*, 310 So. 3d at 1215 (¶22). "A motion for a new trial simply challenges the weight of evidence." *Id.* (citing *Daniels v. State*, 107 So. 3d 961, 963 (¶12) (Miss. 2013)). Weight and credibility are matters for the jury to resolve. *Lacey*, 310 So. 3d at 1214 (¶18). This Court "do[es] not sift through conflicting evidence and weigh alternative theories like a juror." *Id.* The jury is the fact-finder, and this Court will not "assume[] the role of juror on appeal." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). The Mississippi Supreme Court has made clear that

> [w]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury. Our role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

*Carson v. State*, 341 So. 3d 995, 1000 (¶11) (Miss. Ct. App. 2022) (quoting *Little*, 233 So. 3d at 289 (¶1)).

**ANALYSIS**

¶23.    Stevenson argues the uncorroborated accomplice testimony was insufficient to convict him because it was "unreasonable, self-contradictory, and substantially impeached."

¶24.    The Mississippi Supreme Court has consistently held that accomplice testimony is

10

sufficient to sustain a conviction. *Ballenger v. State*, 667 So. 2d 1242, 1243 (Miss. 1995) (citing *Flanagan v. State*, 605 So. 2d 753 (Miss. 1992)); *see also Doby v. State*, 532 So. 2d 584, 591 (Miss. 1988); *Ragland v. State*, 403 So. 2d 146, 147 (Miss. 1981); *Jones v. State*, 381 So. 2d 983 (Miss. 1980). The supreme court has also held that the "uncorroborated testimony of an accomplice may be sufficient to convict an accused," and "[w]here there is slight corroborative evidence, the accomplice's testimony is likewise sufficient to sustain the verdict." *Flanagan*, 605 So. 2d at 757-58 (quoting *Mason v. State*, 429 So. 2d 569, 571 (Miss. 1983)). "The particular testimony needing corroboration is the portion tying the defendant to the crime." *Grossley*, 127 So. 3d at 1148 (¶14) (citing *Mangum*, 762 So. 2d at 342 (¶12)).

¶25. Nevertheless, the supreme court has emphasized that "[uncorroborated] testimony should be viewed with great caution and suspicion." *Catchings v. State*, 394 So. 2d 869, 870 (Miss. 1981) (citing *Moore v. State*, 291 So. 2d 187 (Miss. 1974)).[5] When the uncorroborated testimony of an accomplice is "unreasonable, self-contradictory or substantially impeached," the general rule is inapplicable, and such testimony cannot support a guilty verdict. *Flanagan*, 605 So. 2d at 758. Therefore, "where [accomplice testimony] is uncorroborated, it must also be reasonable, not improbable, self-contradictory or substantially impeached." *Hendrix v. State*, 957 So. 2d 1023, 1027 (¶8) (Miss. Ct. App. 2007) (quoting *Jones v. State*, 740 So. 2d 904, 910 (¶17) (Miss. 1999)). The credibility and

---

[5] The trial court provided the following jury instruction: Stevenson, Hurts, and Washington "are accomplices . . . and the uncorroborated testimony of an accomplice is to be considered and weighed with great care, caution and suspicion. You may give it such weight and credit as you deem it is entitled."

11

reasonableness of the testimony is a determination for the jury. *Hendrix*, 957 So. 2d at 1028 (¶10) (citing *Beyers v. State*, 930 So. 2d 456, 458 (¶11) (Miss. Ct. App. 2006)); *see also Cochran v. State*, 278 So. 2d 451 (Miss. 1973).

¶26.    In *Osborne v. State*, 54 So. 3d 841 (Miss. 2011), the Mississippi Supreme Court discussed convictions based on the uncorroborated testimony of an alleged accomplice. *Id.* at 847 (¶22).  In that case, Osborne and Braboy planned to rob Jackson, an elderly woman living alone. *Id.* at 841 (¶2).  They observed that Giles attended church with Jackson and frequently checked on her. *Id.*  On the day of the robbery, Osborne and Braboy approached Giles and demanded that he knock on Jackson's door. *Id.*  Giles complied, and after he identified himself, Jackson unlocked and opened the door. *Id.*  Osborne and Braboy rushed in and assaulted Jackson, and Giles fled the scene. *Id.*  Jackson's body was discovered two days later, and she had died from a head injury resulting from blunt-force trauma. *Id.*  Osborne, Giles, and Braboy were indicted on one count of capital murder with the underlying felony of robbery. *Id.* at (¶3).  A jury found Osborne guilty of capital murder, and he was sentenced to life imprisonment without the possibility of parole. *Id.*  Osborne appealed his conviction and argued that his conviction was based on "the unreliable inconsistent testimony of Giles, an accomplice, and Wesley Jefferson, an informant." *Id.* at 846 (¶18).  In addition, Osborne asserted that "the lack of physical evidence linking him to the crime, combined with unreliable testimony, fail[ed] to support the jury's guilty verdict." *Id.*

¶27.    On appeal, the supreme court disagreed with Osborne and found Giles's testimony was corroborated.  The supreme court emphasized that "only slight corroboration of an

accomplice's testimony is required to sustain a conviction [and the] testimony that must be corroborated is the part connecting [Osborne] to the crime." *Id.* at 847 (¶22). The supreme court said Giles's testimony connected Osborne to the robbery that resulted in Jackson's death. *Id.* at (¶23). At trial, Giles's testified that he stood and watched Osborne beat Jackson with his fists and a stick during the attack. *Id.* at 846 (¶19). Similarly, Jefferson's testimony connected Osborne to the crime. Jefferson was incarcerated at the same prison as Osborne, and he testified that Osborne had discussed Jackson's murder. *Id.* at (¶20). The supreme court explained that Giles's testimony was corroborated because Jefferson's testimony also "connected Osborne to the crime and substantially mirrored Giles's account of the events." *Id.* at 847 (¶23).

¶28. The supreme court also addressed Osborne's claim that Giles's inconsistent statements rendered his testimony unreliable. The court explained that although Giles initially gave inconsistent statements to investigators and the district attorney, he explained his actions at trial. Giles testified that he gave inconsistent statements because he feared for his grandmother's safety. He said Osborne had threatened to kill his grandmother if he told anyone what happened. Therefore, his testimony "was reasonable and not substantially impeached." *Id.* at (¶22).

¶29. This Court addressed a similar issue regarding accomplice testimony and the corroborative evidence necessary to sustain a conviction in *Grossley*, 127 So. 3d at 1148 (¶13). In that case, Grossley was convicted of aggravated assault and armed robbery "based in part on the accomplice testimony" of Moore. *Id.* at 1143 (¶1). Moore implicated Grossley

13

in the robbery attempt and testified at Grossley's trial that Grossley fired the pistol during the robbery attempt. Grossley appealed his convictions arguing the evidence was insufficient to sustain his convictions. Specifically, Grossley argued that the "State's case rested solely on the substantially impeached, self-contradictory, uncorroborated accomplice testimony." *Id.* at 1148 (¶13). On appeal, this Court explained that slight discrepancies between accomplice testimonies do not render the testimonies "unreasonable, self-contradictory or substantially impeached" when the testimony is corroborated by other evidence. *Id.* at (¶15). This Court noted that Williams, the victim of armed robbery, and the State's ballistic expert also testified at Grossley's trial, and their testimonies supported the portion of Moore's testimony that connected Grossley to the crimes. For example,

> Williams testified about a second African American male standing next to the getaway car during the attempted robbery. That man's face, like Moore's, was covered with a bandana. Unbeknownst to Williams at the time, Grossley and Moore were the car's only African American occupants. . . . So Williams's description of the second masked man tends to support Moore's testimony that Grossley participated in the attempted robbery.

*Id.* Likewise, the State's ballistic expert testified that the bullets recovered from the crime scene "had unquestionably been fired from a .32-caliber revolver—not the .38 caliber revolver Moore claimed he displayed during the failed robbery." *Id.* at (¶16). This Court found "this forensic evidence, when taken in the light most favorable to the State, more than 'slightly corroborates' Moore's testimony that Grossley provided cover during the robbery attempt by firing a .32-caliber revolver at Williams," and "the evidence that Grossley shot at [Williams was] also sufficient to support the aggravated-assault charge." *Id.*

¶30. Stevenson raises the exact issue in this appeal that was raised in *Osborne* and

14

*Grossley*. Here, Hurts's testimony was corroborated by other witnesses and forensic evidence. Hurts testified that Stevenson shot a .223-caliber assault rifle from inside the vehicle, jumped out of the vehicle, and continued to shoot on foot. Frye collected .223-caliber shell casings from inside the gold SUV and on the roadway, proving that the shooter continued firing after exiting the vehicle. Hathcock testified that a .223-caliber bullet was lodged in Jackson's back. Further, Sergeant Fleming testified that a path connected Holiday Apartments and Marilyn Heights, allowing the shooter to flee to Marilyn Heights on foot. Only slight corroboration of an accomplice's testimony is required to sustain a conviction. *Grossley*, 127 So. 3d at 1148 (¶14) (citing *Osborne*, 54 So. 3d at 847 (¶22)).

¶31. Moreover, "perhaps most important to [appellate] review is the fact that the jury was free to accept the testimony of one accomplice over the other's, as 'issues of weight and credibility of a witness's testimony are within the sole province of the jury as fact-finder.'" *Grossley*, 127 So. 3d at 1149 (¶21) (citing *Price v. State*, 23 So. 3d 582, 586 (¶17) (Miss. Ct. App. 2009) (quoting *King v. State*, 798 So. 2d 1258, 1262 (¶14) (Miss. 2001))). It is within the province of the jury to accept parts of the testimony and to reject parts of the testimony of any witness, and the jury may give consideration to all inferences flowing from the testimony. *Young v. State*, 425 So. 2d 1022, 1024 (Miss. 1983) (citing *Grooms v. State*, 357 So. 2d 292 (Miss. 1978)).

¶32. Stevenson also argues Hurts's testimony was "unreasonable, self-contradictory, and substantially impeached" because of the inconsistencies. However, this Court has previously held that "prior inconsistent statements of an accomplice, if explained at trial, do not

15

necessarily render the testimony [self-contradictory and] 'substantially' impeached." *Maggett v. State*, 230 So. 3d 722, 730 (¶18) (Miss. Ct. App. 2016) (citing *Osborne*, 54 So. 3d at 847 (¶23)). Likewise, Stevenson asserts that a photograph presented at trial proved that Hurts's testimony was self-contradictory and substantially impeached. The photograph was taken two hours before the shooting and showed Hurts in the back seat of the vehicle holding the assault rifle. Stevenson's counsel confronted Hurts with the photograph, and Hurts explained that everybody took pictures with the weapons that night. When viewed in the light most favorable to the State, the evidence is sufficient for a rational juror to find Stevenson guilty beyond a reasonable doubt.

¶33. Again, the credibility and reasonableness of a witness is within the province of the jury. The Mississippi Supreme Court held that it is the sole responsibility of the jury to weigh the credibility of the witnesses and resolve conflicts in testimony. *Little*, 233 So. 3d at 289 (¶1). "[F]urther, the appellate court 'is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Lacey*, 310 So. 3d at 1215 (¶22) (quoting *Little*, 233 So. 3d at 289 (¶1)). We find that the verdicts were not contrary to the weight of the evidence.

## CONCLUSION

¶34. After reviewing the record, we find that a reasonable juror could have found Stevenson guilty of the crimes charged, and the trial court did not err by denying Stevenson's motion for a directed verdict. Likewise, when viewing the evidence in the light most

16

favorable to the verdicts, we cannot conclude the jury's guilty verdicts contradicted the overwhelming weight of the evidence.

¶35. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**