605 So.2d 753 (1992)
James M. FLANAGAN
v.
STATE of Mississippi.
No. 07-KA-59615.
Supreme Court of Mississippi.
July 29, 1992.
*754 Anselm J. McLaurin, McLaurin & McLaurin, Brandon, for appellant.
Michael C. Moore, Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PITTMAN and BANKS, JJ.
BANKS, Justice, for the Court:

I
Here we are called upon to consider a conviction based on the uncorroborated testimony of an alleged accomplice. We are urged to adopt a rule making such convictions invalid per se. We decline the invitation. Nevertheless, we find the instant case appropriate for the application of our rule that uncorroborated testimony of an alleged accomplice which is contradictory, improbable and substantially impeached will not support a conviction. Applying that principle, we reverse and render.

II
This case is before this Court on appeal from the Circuit Court of Rankin County, where on August 16, 1988, James "Bubba" Flanagan (Flanagan) was convicted by a jury for conspiracy to manufacture marijuana. The April 1988 indictment listed the offense as having occurred "on or about" June 13, 1988. Before trial, the State moved to amend the indictment to reflect the correct date, and the court entered an order amending the indictment to reflect the date of the alleged occurrence as June 13, 1987. A second amendment to the indictment was granted during trial, after the state had rested its case and Flanagan had made a motion for directed verdict. The trial court, over Flanagan's objection, allowed the State to amend the indictment changing the date from June 13, 1987 to June 12, 1987.
Flanagan was sentenced to serve a term of three years in the custody of the Mississippi Department of Corrections, with two years and six months of that sentence suspended, a fine of two thousand ($2,000) dollars, and five years probation. After Flanagan's Motion for a New Trial was denied, he appealed to this Court for review, asserting an insufficiency of the evidence and error in allowing the trial amendment to the indictment. Finding the issue of the sufficiency of the evidence dispositive, we pretermit any discussion of the amendment issue.

III
Sometime in 1986, an unknown individual advised John Edwards, then investigator for the Rankin County Sheriff's Department, that there was a possibility of marijuana growing on his property. After the warning, Edwards solicited the help of the narcotics bureau to fly over and check his property. There was nothing found at this time. In 1987, Edwards was again told that marijuana was on his property. On June 10, 1987, he called the narcotics bureau and once more requested that they check his property. As the previous investigation, this one proved fruitless as well.
Clay Flanagan (Clay), the defendant's son, returned home from a drug treatment unit on June 10, 1987, and requested that Edwards come to his father's house. Accompanied by investigator, Don Bray, Edwards went to the Flanagan home. There, Clay told Edwards that he was drug free and wanted to turn over some marijuana that he had buried a long time ago. Additionally, Clay admitted to Edwards that he had planted marijuana on Edward's property in 1986. Edwards then told the defendant to check the property to ensure that there were not any drugs left. Edwards stated that he did not suspect Flanagan of illegal conduct at this point. The next day Edwards saw Flanagan and inquired if he had checked the property for marijuana. Flanagan answered in the negative, but assured Edwards that he was on his way to take care of it. Flanagan testified that he borrowed a horse and rode to the spot where Edwards told him to look, but he did not see any marijuana.
*755 Herbert Lee Duckworth, also known as and at times herein referred to as "Cowboy", discovered that an investigation was being conducted in the area involving marijuana on some property. On June 12, 1987, he went to the home of John Edwards, where he informed Edwards that Flanagan solicited his help in planting marijuana on Edwards' property. The next day, Duckworth escorted Edwards and other law enforcement agents to the location in the woods where he had planted the marijuana.
Edwards testified that he rarely traveled on that part of his property and had Duckworth not approached him, he would have never found the marijuana, since the stalks were planted in thick plots in the woods. The officers found approximately one hundred, freshly cultivated, marijuana plants. Subsequently, Flanagan and Duckworth were charged with conspiracy to manufacture marijuana.
At trial Flanagan vigorously protested his innocence. The problem, he asserts, is that, he was burdened with a son, Clay, who had a propensity for marijuana and cocaine and little respect for his father. For years, Clay grew marijuana on a portion of his father's one-hundred or so acres of land. Each time Flanagan discovered the substance on his property, he destroyed it. As any concerned parent, not meaning to obstruct the law, yet seeking to protect his son, Flanagan did not contact the authorities. After growing tired of the constant problem with Clay, Flanagan spoke to his ex-wife, Clay's mother, who in turn committed their son to a chemical dependency unit in Jackson, Mississippi.
Flanagan testified that he had given Duckworth, his occasional employee, a key to a gate on his property to allow Duckworth to cut paperwood. At trial, Flanagan recalled that one particular late spring day in 1987, he and a Mr. Andrews were planting watermelon when they noticed Cowboy on Flanagan's property. After Flanagan inquired of Cowboy's presence, Cowboy informed Flanagan that he was there to chop dead trees. Both Flanagan and Andrews testified that they never heard anything to indicate that Duckworth was in fact chopping trees on the property that day.
Sometime after that incident, within three or four days of June 10, 1987, Flanagan discovered about three stalks of marijuana on his property, which were surrounded by fresh foot tracks. Flanagan stated that he knew the tracks were not made by his son, since he was in a rehabilitation center. Flanagan assumed the tracks to be Cowboy's, because he had seen him in that area several times. When Flanagan saw Cowboy, he firmly told him to remove the stalks, if they were his, or else Flanagan would have someone remove them. According to Flanagan, the confrontation sparked hostility from Cowboy. Three days later, Cowboy informed Flanagan that he had taken care of the marijuana because `they' thought that the marijuana was Flanagan's and his. Flanagan's pertinent testimony was:
"About three or four days later, I was coming out of Spaceway, a little ole gas station there in Pelahatchie, as I was going in Cowboy was coming out, and I said, Cowboy did you take care of that matter that I told you to. And he said, `yes sir Mr. Bubba, I did.' Said, `don't you worry about it. Said, they ain't going to bother it.' I said, what are you talking about. He said, they think it is mine and yours see.'"
Cowboy never told Flanagan to whom he was referring. Flanagan then told Cowboy that Cowboy needed to obtain help from an attorney.
Duckworth had worked for Edwards, as well as Flanagan, and testified that he approached Edwards about the marijuana because he knew that Edwards and Flanagan were good friends and felt that if he told Edwards that the marijuana was both his and Flanagan's, Edwards would give him a chance to pull it, "and that would be it." When questioned about the alleged agreement between him and Flanagan, Cowboy stated that he and Flanagan never made an agreement about the marijuana.
As with all things, there are two sides to every story. Cowboy's testimony is likened to the grade school game entitled *756 "Rumors" or "Pass Along", where one player passes on a statement to another person, who in turn, passes the statement to another, until the statement reaches the originator, at which point, the statement has been so severely altered that it has lost its originality. Here, however, Duckworth was the sole player in this game. Each time he attempted to give his version of the story, the facts changed.
Initially, Cowboy told the jury that Flanagan paid him to grow marijuana. He denied Flanagan's version of their discussions of marijuana. He testified that he and Flanagan engaged in two conversations, one around November 1986 when Flanagan asked him if he knew anything about marijuana to which Duckworth replied in the negative. The other conversation allegedly took place in January 1987 when Flanagan again allegedly asked the same question, which Duckworth again replied in the negative. However, on cross his testimony evinced that he had knowledge surrounding the method of "setting out and planting" marijuana.
The facts adduced at trial established that this was only the beginning of several contradictory statements by Duckworth, leading to substantial impeachment. Duckworth testified that in April 1987, he and Flanagan decided to plant marijuana. According to Duckworth, Flanagan supplied him with marijuana seeds to plant, which he allegedly planted in two places, receiving two to three hundred dollars every other week from Flanagan as the plants grew. However, he later testified that he planted marijuana in three different places and that Flanagan never paid him any money to help grow marijuana. The pertinent testimony is:
Q. Now do you have any evidence that you can put before this jury that Bubba Flanagan handed you fifteen hundred dollars to help you grow marijuana?
A. I wasn't getting it to help grow no marijuana.
Q. Well why were you getting money from him?
A. To loan out.
Q. That is the money that you have been loaning out?
A. That's right.
Q. And he wasn't paying you to help him grow marijuana?
A. Right.
Q. Now you are sitting here today telling this jury that you didn't know anything about planting any marijuana, is that right?
A. That's right.
On cross-examination, Cowboy changed his story. He testified that he never received any money from Flanagan to plant marijuana. Instead, Cowboy stated that he received money from Flanagan which he in turn loaned at an excessive interest to Robert and Connie Harris. Robert Harris confirmed that he and his wife owed Duckworth money that he had loaned them. According to Harris, Duckworth approached and propositioned him around April 1987 to help grow marijuana. Robert testified that Duckworth did not want Connie to know about the proposition, because she worked for Flanagan and he feared that she would inform Flanagan.
After Harris refused to help Duckworth plant marijuana to generate funds, Harris saw Cowboy at a club in Jackson where Cowboy told him that the marijuana crop had fallen through and that he thought Flanagan was the cause of his being arrested. Harris and his wife saw Duckworth on another occasion, where they paid him money they owed, and he allegedly told them that he was thinking about checking into Whitfield to keep from testifying against himself.
In exchange for his testimony, Duckworth received a thirty-day jail sentence. He stated that he was forced to testify: "I got to hurt somebody else to protect myself, I don't like that part of it. But I don't want to hurt myself helping nobody else neither." Duckworth stated that he knew that he did not have to testify, but that he was not going to make the District Attorney go against him any worse than he already was.
The defense witnesses painted a picture of Flanagan as a law-abiding citizen, opposed *757 to any involvement with marijuana, but with a troubled son. Flanagan's nephew, William Michael Flanagan, revealed that he and Clay smoked marijuana, but never around Flanagan because he would get upset. Other evidence regarding Flanagan's troubles with his son Clay included the testimony of Billy Madrie. Madrie told the court that, while on Flanagan's land one day, he saw Clay and another boy riding around. Madrie and Flanagan investigated the area where they saw the boys. There they found about fifty to sixty stalks of marijuana. Madrie suggested that Flanagan discipline Clay about the marijuana. In turn, Flanagan replied that Clay would "grow out of it." The men pulled the marijuana from the ground and destroyed it. About two days later, Madrie and Flanagan were in the pasture when Clay approached and cursed his father for destroying his plants. According to Madrie, Clay used strong language to the effect that he would kill anybody who messed with his "stuff".

IV.
We will not set aside a guilty verdict for the reason that it is against the weight of the evidence, unless it is clear that the verdict is the result of bias, prejudice or is manifestly against the overwhelming weight of the evidence. Jones v. State, 481 So.2d 798, 804 (Miss. 1985) quoting Simmons v. State, 301 So.2d 565, 568 (Miss. 1974). Additionally, we have stated:
Our general concern is whether there is in the record evidence sufficient to support the jury's verdict. As we have said repeatedly, the jury is charged with the responsibility for weighing and considering conflicting evidence and the credibility of witnesses... . Once the jury has returned a verdict of guilty in a criminal case, we are not at liberty to direct that the defendant be discharged, short of a conclusion on our part that the evidence, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty. See gen. Dickerson v. State, 441 So.2d 536, 538 (Miss. 1983).
Conspiracy is the combination of two or more persons to accomplish an unlawful purpose. Miss Code Ann. § 97-1-1; Smallwood v. State, 584 So.2d 733, 741 (Miss. 1991); Rose v. State, 556 So.2d 728 (Miss. 1990). The agreement may be shown by circumstantial evidence. In other words, the agreement needed to establish a conspiracy need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts, and conduct of alleged conspirators. Griffin v. State, 480 So.2d 1124, 1127 (Miss. 1985) The crime of conspiracy requires the participation of two or more individuals. In Moore v. State, 290 So.2d 603 (Miss. 1974) we asserted:
Since a conspiracy to commit a crime is different from the crime that is the object of the conspiracy, the first necessarily involves joint action while the other does not. By its very nature, conspiracy is a joint or group offense requiring a concert of free will. The union of the minds of at least two persons is a prerequisite to the commission of the offense, or, stated differently, at least two persons must agree for a conspiracy to exist. 290 So.2d at 604. See also Griffin, 480 So.2d at 1126; Norman v. State, 381 So.2d 1024, 1028 (Miss. 1980).
Mere association with conspirators is insufficient. Davis v. State, 485 So.2d 1055 (Miss. 1986). There must exist some evidence that a defendant associated himself with the venture. See Rose v. State, 556 So.2d 728, 733 (Miss. 1990) citing Peoples v. State, 501 So.2d 424, 428 (Miss. 1987).
Generally, the law in Mississippi is that a co-conspirator's testimony is enough to sustain a conviction, Doby v. State, 532 So.2d 584, 591 (Miss. 1988); Ragland v. State, 403 So.2d 146, 147 (Miss. 1981); Jones v. State, 381 So.2d 983 (Miss. 1980) citing Lifer v. State, 189 Miss. 754, 199 So. 107 (1940). See also Mason v. State, 429 So.2d 569, 571 (Miss. 1983) where this Court held:
[T]he uncorroborated testimony of an accomplice may be sufficient to convict an accused. Where there is slight corroborative *758 evidence, the accomplice's testimony is likewise sufficient to sustain the verdict.
429 So.2d at 571.
However, the general rule is inapplicable in those cases where the testimony is unreasonable, self contradictory or substantially impeached. Mason, at 571.
Here we apply the latter rule. Flanagan is implicated with the marijuana in question solely by Duckworth. We find that Duckworth's testimony is sufficiently self-contradictory and impeached to render it inadequate as the sole evidence upon which to sustain a conviction.
Duckworth clearly contradicted himself concerning payments allegedly made to him by Flanagan. His testimony was explicitly motivated by his desire to escape a long term of imprisonment. Robert Harris also had reasons for bias. His wife worked part-time for Flanagan. Nevertheless, his testimony substantially impeaches that of Duckworth, even as it coincides with Duckworth's revised testimony concerning the purpose of the money allegedly paid by Flanagan. Although a fair-minded juror could reject Harris' testimony as unconvincing, one could not discard it so completely as to eliminate reasonable doubt, especially when that testimony is combined with Duckworth's self-contradictory statements.
Several witnesses attest to Flanagan's good reputation in the community. Other evidence presented indicated that the times Flanagan found marijuana on his property, he undertook to destroy it. Flanagan testified and flatly denied involvement with the marijuana. None of this, of course, has to be credited by a jury. Nevertheless, nothing in Flanagan's case aided the state. It is left with Duckworth, and that is not enough.

V.
For the foregoing reasons the judgment of the circuit court is reversed and rendered and the defendant is discharged.
REVERSED, RENDERED AND DEFENDANT DISCHARGED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in reversal only.