# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01212-COA

**JAMES DOUGLAS MCKNIGHT A/K/A JAMES MCKNIGHT A/K/A JAMES D. MCKNIGHT**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/21/2013 |
| TRIAL JUDGE: | HON. DAVID H. STRONG JR. |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CHARLES E. MILLER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: STEPHANIE BRELAND WOOD |
| DISTRICT ATTORNEY: | DEE BATES |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNT ONE, MURDER, AND COUNT TWO, POSSESSION OF A FIREARM BY A CONVICTED FELON, AND SENTENCED AS A HABITUAL OFFENDER ON BOTH COUNTS TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PROBATION, PAROLE, OR EARLY RELEASE, WITH THE SENTENCES TO RUN CONSECUTIVELY, AND TO PAY FINES IN THE AMOUNT OF $10,000 ON COUNT ONE, AND $1,000 ON COUNT TWO, AND $6,000 IN RESTITUTION |
| DISPOSITION: | AFFIRMED - 05/19/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND MAXWELL, JJ.**

**BARNES, J., FOR THE COURT:**

¶1. James McKnight was convicted of murder and possession of a firearm by a convicted felon and was sentenced to life in the custody of the Mississippi Department of Corrections (MDOC) on both counts, as a habitual offender without possibility for probation, parole, or early release, with the sentences to run consecutively.

¶2. On appeal, McKnight argues that numerous errors warrant a new trial. Finding no reversible error, we affirm McKnight's convictions and resulting sentences.

## FACTS AND PROCEDURAL HISTORY

¶3. On August 30, 2011, James McKnight contacted Mary Marsalis, asking if she had seen a mutual acquaintance, Derrick Witherspoon, also known as "Twin." Mary stated she had not seen Twin, and McKnight asked her to let Twin know McKnight was looking for him. A few minutes later, Twin arrived at Mary's house, and Mary related McKnight's desire to talk to him. Mary then called McKnight on the telephone, and Twin spoke with him. When Twin hung up the phone, he told Mary that McKnight was on his way to her house.

¶4. Shortly thereafter, McKnight, his wife, Barbara, and Alreco Hill, a friend of the McKnights, pulled up in McKnight's SUV. McKnight was upset because he had not heard from his adult son, James "J.J." McKnight Jr., in several days, and he suspected that Twin was involved with J.J.'s disappearance. Twin claimed he did not know where J.J. was, but McKnight did not believe him and continued to question him. McKnight asked Twin to get into the SUV several times, and Twin finally complied.

¶5. The four drove off and proceeded through the town of McComb, Mississippi, with

2

McKnight continuing to question Twin regarding J.J.'s whereabouts. When the SUV stopped at a traffic light, Twin tried to jump out of the vehicle. McKnight pulled out a .380 caliber gun and warned Twin that if he tried to run away again, McKnight would shoot him. Twin sat back in his seat and closed the door. The SUV later stopped at the intersection of Avenue E and Locust Street, and Twin jumped out of the vehicle and ran away. According to Hill, McKnight fired two shots and pursued Twin. Hill also got out of the SUV, following McKnight. McKnight fired more shots at Twin, and then McKnight and Hill returned to the SUV. McKnight told Hill, "What just happened stays in the truck."

¶6. While these events were occurring, David Wells and Terry Williams, McKnight's uncle, were helping a neighbor move into a nearby home on Locust Street. Wells was sitting outside the home, and heard the gunfire. He saw the doors to the SUV open and three people run from the vehicle. Williams, who was in the garage, also heard the shots and ran outside. He observed two men running from the SUV, which he recognized as belonging to his nephew, McKnight. Williams heard more gunfire as he began walking toward the SUV. As Williams attempted to question Barbara about the situation, he encountered McKnight and Hill returning to the SUV. McKnight was holding a gun. The two men got into the SUV with Barbara, and the three drove away. Williams returned to his friend's home and told Wells that "his nephew done got himself in some trouble." Wells called 911 and reported the incident.

¶7. Barbara dropped McKnight off at his father's home, and then drove back to Mary's house to instruct her to say that Mary had not seen Twin that day. Hill and Barbara then went

3

to the McKnights' house to pick up clothes and the McKnights' two younger sons, picked up McKnight at his father's house, and drove to Jackson, Mississippi. Soon thereafter, J.J., who was in Oklahoma and avoiding his father because of an argument, called Hill's phone and talked to McKnight. Since Hill's mother lived in Jackson, McKnight dropped him off there, telling Hill that "it [was]n't really supposed to happen that way" and instructing him to keep quiet.

¶8.    Police officers recovered Twin's deceased body, along with shell casings from a .380 caliber gun and a partial projectile, in a cane patch near the intersection of Avenue E and Locust Street. An autopsy revealed that Twin died of multiple gunshot wounds, and the manner of death was ruled a homicide. The projectiles removed from the body were determined to be .380 caliber, and they were fired from the same gun. McKnight's SUV was later found stripped and abandoned in Jackson. After a search warrant was issued, the Mississippi Bureau of Investigations processed the vehicle and found a .380 shell casing in the rear cargo area.

¶9.    McKnight was arrested and charged with murder and possession of a firearm by a convicted felon. Barbara and Hill were both charged with accessory after the fact.[1] After a jury trial in Pike County Circuit Court, McKnight was convicted on June 13, 2013, on both counts, and sentenced as a habitual offender pursuant to Mississippi Code Annotated section 99-19-83 ( Rev. 2007) to life in the custody of the MDOC for each count, with the sentences

---

[1] Their cases were severed from McKnight's case. The record is silent as to the outcome of Barbara's case. Hill, who agreed to testify against McKnight, pleaded guilty and was sentenced to ten years, with eight years suspended and two years to serve in the custody of the MDOC.

to run consecutively.[2] He was also fined $10,000 for the murder count, and $1,000 for the possession of a firearm by a convicted felon count.

¶10. Prior to sentencing, McKnight was granted a substitution of counsel; his new attorney filed several post-trial motions, including a motion for a judgment notwithstanding the verdict (JNOV), or alternatively, a motion for a new trial.[3] After a hearing, the circuit court denied all motions. McKnight now appeals, alleging several errors. Upon review, we find no reversible error and affirm the circuit court's judgment.

## DISCUSSION

### I. Whether the evidence was sufficient to sustain the verdict.

¶11. In his motion for a JNOV, McKnight argued that the State's case relied entirely on circumstantial evidence; thus, the evidence was not sufficient to sustain the verdict. The circuit court denied his motion. On appeal, he reasserts this argument, claiming that the witnesses' testimonies were unreliable.

¶12. "A motion for JNOV challenges the legal sufficiency of the evidence." *Abeyta v. State*, 137 So. 3d 305, 311 (¶14) (Miss. 2014) (quoting *Taylor v. State,* 110 So. 3d 776, 782 (¶19) (Miss. 2013)). In its determination of whether to grant or deny the motion, the circuit

---

[2] McKnight had two prior felony convictions, for which he served a term of one year or more, with at least one conviction being a crime of violence. *See* Miss. Code Ann. § 99-19-83. On October 21, 1981, McKnight pleaded guilty to attempted armed robbery without a firearm, and he was sentenced to twelve years in the custody of the MDOC. On March 30, 1992, he pleaded guilty to accessory before the fact of robbery, and was sentenced to five years.

[3] The substituted counsel, Charles Miller, also made an appearance at the trial, stating that he would represent McKnight at trial if a continuance could be granted. As the circuit judge denied the continuance, McKnight proceeded with his already-assigned trial counsel.

5

court "considers the credible evidence in the light most favorable to the verdict." *Id.*

> If after viewing all credible evidence in the light "most favorable to the State, the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed," then the evidence will be deemed legally sufficient and the verdict will be upheld.

*Riley v. State*, 126 So. 3d 1007, 1010 (¶12) (Miss. Ct. App. 2013) (quoting *Melton v. State,* 118 So. 3d 605, 610 (¶20) (Miss. Ct. App. 2012)).

¶13.    McKnight was convicted of murder under Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2006), which defines murder as "[t]he killing of a human being without the authority of law by any means or in any manner . . . .[w]hen done with deliberate design to effect the death of the person killed, or of any human being[.]"  He was also convicted of possession of a weapon by a convicted felon pursuant to Mississippi Code Annotated section 97-37-5(1) (Supp. 2012), which states that "[i]t shall be unlawful for any person who has been convicted of a felony under the laws of this state, any other state, or of the United States to possess any firearm[.]"  We find the evidence sufficient to support McKnight's convictions on both counts.

¶14.    Marsalis saw Twin get into the SUV with McKnight and the others shortly before his death.  Hill testified that McKnight threatened Twin with a gun and then fired the gun at Twin multiple times when he ran from the SUV.  The evidence revealed that Twin died as a result of gunshot wounds, and the projectiles retrieved from Twin's body match the caliber of the gun that McKnight was believed to have possessed.   McKnight's uncle, Terry Williams, stated that he saw a gun in McKnight's hand after he heard the gunshots fired.

6

McKnight's other uncle, Bruce Williams, testified that he saw McKnight the morning of Twin's murder and that McKnight was upset over his son's disappearance. He further stated he saw a .380 caliber gun in McKnight's vehicle approximately a week prior to the shooting. The shell casings confiscated from McKnight's SUV and the crime scene were .380 caliber.

¶15. Viewing the evidence and testimony in the light most favorable to the verdict, this Court finds there is sufficient evidence to support McKnight's convictions.

## II. Whether the verdict was against the overwhelming weight of the evidence.

¶16. McKnight also argues that a new trial is warranted, as the verdict was against the overwhelming weight of the evidence. "[A] motion for a new trial challenges the weight of the evidence." *Riley*, 126 So. 3d at 1010 (¶12) (quoting *Melton,* 118 So. 3d at 609 (¶17)). Unless the jury's verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice," we will not disturb it on appeal. *Id.* (quoting *Melton*, 118 So. 3d at 610 (¶17)).

¶17. McKnight argues that he is entitled to a new trial because Hill's testimony was "unreliable" and "self-serving," as he was a co-defendant. He cites *Flanagan v. State*, 605 So. 2d 753 (Miss. 1992), a case in which the defendant was convicted solely on testimony by an alleged co-conspirator. The Mississippi Supreme Court concluded in *Flanagan* that the uncorroborated testimony of alleged accomplice, which was contradictory and substantially impeached, would not support a conviction for conspiracy to manufacture marijuana. *Id*. at 758.

¶18. The State argues that Hill was not an accomplice; he was charged as an accessory after

7

the fact for assisting McKnight after Twin's murder. We agree.

> Our supreme court has described an accomplice as "a person who is implicated in the commission of the crime." *Slaughter v. State,* 815 So. 2d 1122, 1134 (¶66) (Miss. 2002). In other words, if the evidence gives a reasonable inference that the person may have been a co-perpetrator or the sole perpetrator, then the person is an accomplice. *Id.* (quoting *Williams v. State,* 729 So. 2d 1181, 1188 (¶31) (Miss. 1998)). On the other hand, an accessory-after-the-fact has been defined as "a person assisting one who has completed the commission of a felony to avoid being apprehended, arrested, convicted, etc." *Chase v. State,* 645 So. 2d 829, 851 (Miss. 1994).

*Bailey v. State*, 960 So. 2d 583, 590 (¶30) (Miss. Ct. App. 2007). In *Bailey*, we found "[n]o evidence . . . that Tharpe agreed with Bailey to murder Kirtland, that she planned the murder, that she helped Bailey stab Kirtland or that she encouraged Bailey at any time during the murder." *Id*. at (¶31). Rather, the evidence demonstrated that Tharpe helped Bailey clean up after the murder and failed to notify authorities of the murder until confronted with evidence more than a year later. *Id*. Because "Tharpe's actions assisted Bailey after the murder[,] and . . . her silence allowed Bailey to avoid being apprehended and punished[, her] actions are considered those of an accessory-after-the-fact, the charge to which she pled guilty." *Id*.

¶19. Similarly, in this case, there was no evidence presented that Hill helped plan or facilitate Twin's murder. While Hill did leave the SUV with McKnight, there is no evidence that he assisted McKnight in shooting Twin or had planned to do so. The only other evidence of his participation was going to Mary's house to instruct her to keep silent and assisting McKnight and his wife in going to Jackson to avoid arrest. He also waited a few days before notifying authorities of his involvement.

8

¶20. Moreover, the alleged accomplice's testimony in *Flanagan* was refuted by other testimony and entirely uncorroborated. Here, although Hill was the only person who testified that McKnight shot Twin, several witnesses corroborated Hill's version of the events surrounding Twin's murder. Marsalis saw Twin get into the vehicle with McKnight and Hill. Terry Williams saw McKnight with a gun in his hand after he heard the shots and saw the men running. Thus, Hill's testimony was not substantially impeached. As to the reliability and weight of Hill's testimony, the supreme court has held that "the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Gathright v. State,* 380 So. 2d 1276, 1278 (Miss. 1980). The jury listened to Hill's testimony, including his admission that he had initially lied to police and evidently believed his testimony that McKnight shot at Twin multiple times.

¶21. When viewed in the light most favorable to the verdict, we find the weight of the evidence does not preponderate so heavily against the verdict that to allow it to stand would sanction an unconscionable injustice. Accordingly, we hold that the circuit court correctly denied McKnight's motion for a new trial.

### III. Whether probable cause existed to arrest McKnight.

¶22. After an arrest warrant was issued for McKnight, he surrendered to authorities in Tulsa, Oklahoma, and waived his right to extradition. McKnight did not address this issue prior to trial. Rather, in his motion for a JNOV, McKnight claimed for the first time that he was subject to an illegal arrest. He claims on appeal that his arrest was illegal and not based on probable cause because of the "lack of corroborative evidence and the unreliability of

9

[S]tate witnesses."

¶23.  We find no basis for McKnight's argument on appeal.  "Arrest warrants or search warrants shall be issued only by the judge after a judicial determination that probable cause exists based upon the affidavit or other evidence before the court." *State v. Woods*, 866 So. 2d 422, 425 (¶10) (Miss. 2003).  Based on the investigation by law enforcement and the conclusions of the medical examiner, there was cause to believe a homicide had been committed.  Marsalis told police that Twin had gotten into the SUV with McKnight shortly before his murder.  Furthermore, Hill gave a statement to police, claiming that McKnight was responsible for the shooting.  Consequently, we find probable cause existed to arrest McKnight for Twin's murder.

**IV.**   **Whether the circuit court erred in denying McKnight's motion to suppress evidence obtained as a result of the search warrants.**

¶24.  McKnight claims there was insufficient probable cause to support the issuance of search warrants for his vehicle and mobile phone.  However, McKnight never filed a motion to suppress the evidence obtained from the search warrants.  At trial, when evidence from the SUV was introduced, no objection was made as to its admissibility.  As McKnight did not raise this claim in circuit court, it is barred from review by this Court.  "Failure to raise an issue at trial bars consideration on an appellate level." *Parisi v. State*, 119 So. 3d 1061, 1066 (¶19) (Miss. Ct. App. 2012) (citing *Walker v. State,* 913 So. 2d 198, 224 (¶86) (Miss. 2005)).  Furthermore, no evidence obtained from McKnight's mobile-phone records was actually admitted at trial.  This issue is barred from appellate review.

**V.**   **Whether the circuit court erred in allowing evidence stemming**

10

**from the photographic lineups.**

¶25. Although McKnight argues that evidence of the photographic evidence was violative of his rights, the record reflects that no evidence of the photographic lineup was presented at trial, which the circuit judge noted in the post-trial motions hearing. Accordingly, this issue is without merit.

**VI.    Whether McKnight received ineffective assistance of counsel.**

¶26. McKnight argues that his trial counsel's failure to file certain motions prejudiced his defense and constituted ineffective assistance of counsel. A claim of ineffective assistance of counsel should only be addressed on direct appeal when "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Luster v. State*, 143 So. 3d 636, 642 (¶23) (Miss. Ct. App. 2014) (quoting *Colenburg v. State*, 735 So. 2d 1099, 1101 (¶5) (Miss. Ct. App. 1999)). "Review of an ineffective-assistance-of-counsel claim on direct appeal is 'confined strictly to the record.'" *Gill v. State*, 126 So. 3d 128, 134 (¶27) (Miss. Ct. App. 2013) (quoting *Colenburg*, 735 So. 2d at 1102 (¶6)).

¶27. We find that the record does not affirmatively show ineffectiveness of constitutional dimensions, nor have the parties stipulated that the record is adequate to allow this Court to make a finding without consideration of the circuit court's findings of fact. Consequently, we deny relief on this issue without prejudice so that McKnight may, if he desires to do so, raise his claim in a proper motion for post-conviction relief.

**VII. Whether the circuit court erred in failing to order a mental evaluation of McKnight.**

¶28. Prior to being sentenced, McKnight filed a post-trial motion for a psychological evaluation. In the motion, McKnight stated the purpose for requesting the evaluation was "twofold: (1) to determine defendant's mental capacity (2) [to m]itigate sentence." After hearing arguments, the circuit judge denied the motion. In his motion for a JNOV, McKnight again raised the issue of a psychological evaluation, but provided no evidence to support a finding that he may have been incompetent to stand trial. "The movant bears the burden of proof to demonstrate by substantial evidence that the defendant is mentally incompetent to stand trial." *Vanwey v. State*, 55 So. 3d 1133, 1136 (¶6) (Miss. Ct. App. 2011) (citing *Jones v. State,* 976 So. 2d 407, 412 (¶13) (Miss. Ct. App. 2008)).

¶29. McKnight now claims on appeal that he "has possible preexisting mental conditions." However, McKnight never states what those mental conditions are. McKnight did supplement the appellate record with a medical report from MDOC dated April 30, 2014. However, as this evidence was never presented to the circuit court, it is not eligible for consideration on appeal. *See Parisi*, 119 So. 3d at 1066 (¶19).

¶30. Accordingly, we find no error in the circuit court's denial of the motion.

**VIII. Whether McKnight was entitled to a change of venue.**

¶31. McKnight filed a motion for a change of venue on February 27, 2013, arguing that "an impartial jury [could not] be obtained" due to "a highly inflammatory" news article in the local paper regarding the alleged murder. However, at a docket call on March 19, 2013, defense counsel explicitly stated that he was not "going forward" with the motion for a

change of venue. "[A circuit] judge will not be found in error on a matter not presented to him for decision." *Hampton v. State*, 148 So. 3d 992, 996 (¶8) (Miss. 2014) (quoting *Ballenger v. State,* 667 So. 2d 1242, 1256 (Miss. 1995)). Therefore, this issue is barred on appeal.

> IX. **Whether the first assigned circuit judge's recusal and the withdrawal from representation by the public defender's office due to conflict of interest prejudiced McKnight.**

¶32. A hearing was held on December 4, 2012, to discuss a potential conflict of interest with McKnight's appointed defense counsel, with counsel admitting that he had represented Hill in municipal court to have his bond reduced. The circuit court granted a continuance and explained to McKnight the necessity because his attorney could not represent him and also represent a witness or co-defendant in the same case. An order granting substitution of defense counsel was granted on January 14, 2013.

¶33. Then, on May 20, 2013, Judge Michael Taylor, the circuit judge originally assigned to the case, entered an order of recusal and a transfer of the case to Judge David Strong. The recusal was due to the fact that Judge Taylor discovered he had signed a search warrant on the case. During the hearing on the motion for a new trial, Judge Strong stated the reason for the recusal, explaining:

> Well, I'll just state for the record again, that Judge Taylor could have heard the case. The only reason he recused himself in this case is simply an agreement between myself and Judge Taylor that when one of us signs warrants, that it might be the better practice, if those warrants are challenged, for the other judge to hear challenges on the warrants. So it's simply an agreement between the sitting judges in the Fourteenth Circuit Court District, that when one judge rules on warrants, then the other judge will preside over the trial of that case in case those warrants are challenged. Again, no legal requirement. Judge

13

Taylor could have – could have heard the case. But due to our agreement, he transferred it to me. *And it was tried expeditiously thereafter*.

(Emphasis added). McKnight claims that he was prejudiced by the delay in Judge Taylor's recusal and original counsel's withdrawal due to the conflict of interest.

¶34. "When a judge is not disqualified under the constitutional or statutory provisions, the decision [to recuse] is left up to each individual judge and is subject to review only in a case of manifest abuse of discretion." *Ford v. State*, 121 So. 3d 325, 327-28 (¶10) (Miss. Ct. App. 2013) (quoting *Johnson v. State,* 70 So. 3d 262, 264 (¶7) (Miss. Ct. App. 2011)). McKnight does not allege that he suffered prejudice as a result of the circuit judge's partiality or bias; he merely claims the delay in the recusal was prejudicial. However, as Judge Strong noted, McKnight's trial was held only one month after Judge Taylor recused himself. As there was no delay as a result of Judge Taylor's recusal and the transfer of the case to Judge Strong, we find McKnight was not prejudiced by the recusal.

¶35. Citing *Armstrong v. State*, 573 So. 2d 1329, 1334-35 (Miss. 1990), McKnight argues that representation by an attorney with an actual conflict of interest constitutes ineffective assistance of counsel and warrants automatic reversal. However, *Armstrong* is wholly inapplicable to the present case. In *Armstrong*, the trial court appointed the same defense counsel to represent two co-defendants, and he represented them in all proceedings leading up to entry of guilty pleas and their sentencing. *Id*. at 1331. Here, once the public defender, Paul Luckett, discovered he had represented Hill in obtaining his bond, he immediately withdrew, and new counsel was promptly substituted.

¶36. We find that McKnight did not suffer any prejudice as a result of defense counsel's

14

withdrawal.  McKnight was granted a continuance and newly appointed counsel had several months to prepare for the trial.   This issue is without merit.

### X.    Whether McKnight's constitutional right to a speedy trial was violated.

¶37.    On June 10, 2013, McKnight entered a motion to dismiss for lack of a speedy trial, arguing that it had been more than one year since he had been indicted (April 24, 2012) and arraigned (June 4, 2012).  At the pretrial motions hearing, McKnight reasserted his right to a speedy trial.  It was noted that his originally appointed defense counsel had to withdraw six months after McKnight's arraignment due to a conflict, and new counsel had to be substituted.  The circuit judge concluded:

> [I]n a technical sense while the length of delay might weigh in Mr. McKnight's favor, the reason for delay certainly does not.  The State can't be held responsible for counsel not discovering a conflict and withdrawing from a case.  It's just impossible to count that against the State in any manner whatsoever.  Consequently, that time that first six months while Mr. [Paul] Luckett was on the case would have to qualify or be counted against Mr. McKnight.  In addition to that, there has never been a demand for a speedy trial unless and until the filing of this motion for a speedy trial which was yesterday, I believe – within the last week.

On appeal, McKnight claims that the delay between the date of his arrest and the date of his trial was sufficient to trigger a violation of his right to a speedy trial.   Although the exact date of McKnight's arrest is not apparent from the record, it may be presumed from the record to have occurred in September 2011.  (A newspaper article in the record, dated September 19, 2011, reported his arrest.)

¶38.    Mississippi Code Annotated section 99-17-1 (Rev. 2007) states: "Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments

15

are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." When addressing the question of a whether a defendant's constitutional right to a speedy trial has been violated, the balancing test set forth by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972), is applied. "Those factors to be considered are: '(1) the length of the delay, (2) the reason for the delay, (3) whether the defendant has asserted his right to speedy trial, and (4) whether the defendant was prejudiced by the delay." *Ellis v. State*, 141 So. 3d 415, 418 (¶8) (Miss. Ct. App. 2013) (quoting *Noe v. State,* 616 So. 2d 298, 300 (Miss. 1993)).

A.    *Length of Delay*

¶39.    "The constitutional right to a speedy trial attaches at the time of arrest, indictment, or information, when a person has been accused." *Jackson v. State*, 121 So. 3d 313, 319 (¶12) (Miss. Ct. App. 2013) (citing *McBride v. State*, 61 So. 3d 174, 179 (¶11) (Miss. Ct. App. 2010)). An eight-month delay or longer between the defendant's arrest and trial "is presumptively prejudicial." *Id*. (quoting *Boone v. State,* 964 So. 2d 512, 519 (¶14) (Miss. Ct. App. 2006)). Since the delay between either McKnight's arrest (September 2011), or his arraignment (June 4, 2012), and his trial was longer than eight months, we must presume prejudice and look to the second factor.

B.    *Reason for the Delay*

¶40.    Once the delay is presumed to be prejudicial, the State bears the burden "to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of these reasons." *Jackson*, 121 So. 3d at 319 (¶13) (quoting *DeLoach v. State,* 722 So. 2d 512, 517

16

(¶17) (Miss. 2008)). However, as already stated, the circuit judge found that the main cause of the trial delay was the substitution of defense counsel six months prior to trial due to a conflict of interest. Furthermore, the circuit court granted McKnight a continuance on March 19, 2013, so that newly appointed counsel could adequately prepare for trial. Subsequently, the assigned circuit judge recused himself on May 7, 2013, and the cause was continued.

¶41. We cannot find fault with the circuit court's determination that the State bore no responsibility for any of these delays. Accordingly, we find this factor weighs against McKnight.

      C.     *Defendant's Assertion of the Right to a Speedy Trial*

¶42. As noted, McKnight filed a "Motion to Dismiss for Lack of a Speedy Trial" on June 4, 2013. "[A] motion for dismissal based on violation of the right to a speedy trial and a demand for a speedy trial are not equivalent, with regard to the *Barker* analysis, as one seeks discharge and the other an immediate trial." *Id*. at (¶14) (quoting *Mims v. State,* 856 So. 2d 518, 521 (¶6) (Miss. Ct. App. 2003)). Since McKnight filed a motion to dismiss a week before his trial, instead of filing a motion demanding a speedy trial, we find this third factor weighs against McKnight.

      D.     *Whether the Defendant was Prejudiced by the Delay*

¶43. There are three interests to be considered when determining whether to find if the defendant has been prejudiced by the delay. *Stark v. State*, 911 So. 2d 447, 452-53 (¶28) (Miss. 2005). "These interests are (1) to prevent oppressive pretrial incarceration, (2) to minimize anxiety and concern of the accused, and (3) to limit the possibility that the defense

will be impaired. The last interest is the most important and, if violated, is the most prejudicial to the defendant." *Id*. at 453 (¶28) (citing *Barker,* 407 U.S. at 532).

¶44. At the pretrial motions hearing, McKnight was allowed to state, before the circuit judge, any potential prejudice he suffered as a result of the delay. He merely claimed that he never had a chance to review discovery or adequately prepare a defense with his appointed counsel – allegations later rebutted by defense counsel. The circuit court concluded no assertions made by McKnight "would lead to prejudice due to his lack of a speedy trial," and his motion was denied.

¶45. As McKnight failed to demonstrate how his pretrial incarceration was oppressive, this interest does not weigh in his favor. As to the second interest, some of the reasons for the delay were indeed out of McKnight's control (the withdrawal of defense counsel and the recusal of the circuit judge), and he did exhibit some concern regarding his defense during his statements to the circuit court; so we find this interest tends to weigh in his favor.

¶46. However, McKnight's defense was not impaired as a result of the delay. In fact, McKnight's defense was likely aided by the delay in the proceedings, as it provided newly appointed counsel with time to prepare for trial. Furthermore, as we have already noted, there was no delay as a result of Judge Taylor's recusal. We further note that McKnight also asked for another continuance immediately prior to trial in order to substitute defense counsel. Therefore, since McKnight did not suffer any prejudice as a result of the delay, we find that the fourth factor also weighs against McKnight.

¶47. Accordingly, based on our analysis of the *Barker* factors, we find the circuit court did

18

not err in denying McKnight's motion to dismiss for lack of a speedy trial.

**XI.    Whether the circuit court erred in admitting evidence of McKnight's prior convictions that were ten years or older and evidence of prior bad acts.**

¶48.    McKnight argues that the circuit court committed error in allowing the State to introduce evidence of prior convictions or bad acts at trial. McKnight filed a motion in limine on March 14, 2013, to exclude evidence of other crimes or bad character. However, as the circuit judge noted at the hearing on McKnight's post-trial motions, no evidence of McKnight's prior convictions was ever introduced at trial, "with the exception of the defendant's stipulation that he was a convicted felon." The circuit judge's finding is supported by the record. No evidence of any prior convictions or bad acts was presented at trial, except for the stipulation, which merely informed the jury that McKnight was a convicted felon under the laws of the State of Mississippi. Therefore, this issue is without merit.

**XII.    Whether the circuit court erred in refusing McKnight's jury instruction presenting his theory of defense.**

¶49.    Although McKnight argues that a defendant must be allowed to present an alternate theory of defense, nowhere does he state which jury instruction was allegedly refused, nor does the record contain evidence that the circuit judge refused any such instruction. This issue is without merit.

**XIII.    Whether the circuit court erred in admitting hearsay testimony under Mississippi Rule of Evidence 803(3).**

¶50.    McKnight claims that the testimonies of Katrina Harris, David Wells, and J.J.

19

McKnight Jr. were inadmissible as hearsay. After review, we find the testimonies provided by Wells and J.J. were properly admitted under Mississippi Rules of Evidence 801 and 803. Further, while a minor portion of Harris's testimony was inadmissible hearsay, we find its admission constitutes harmless error and does not warrant a reversal.

### A. Katrina Harris

¶51. A week prior to his murder, Twin talked with Harris and asked her for money to leave town. At trial, Harris related Twin's statement to her at the time: "Well, 'Trina, if something happen to me, Mr. James [McKnight] did it." Defense counsel objected to Harris's testimony as hearsay, and the matter was discussed outside the jury's presence. The State cited *Hall v. State*, 39 So. 3d 981 (Miss. Ct. App. 2010), to support its assertion that Harris's testimony was admissible hearsay under Mississippi Rule of Evidence 803(3). That rule exempts a statement from the hearsay rule if it is "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)"; however, the rule expressly excludes *"a statement of* memory or *belief to prove the fact* remembered or *believed*." *Id*. (emphasis added). The circuit judge overruled defense counsel's objection and allowed Harris's testimony to be admitted as an exception to the hearsay rule.

¶52. We find *Hall* distinguishable from the present case. In *Hall*, the witness testified that the victim explicitly stated that the defendant called and threatened to kill her over losing money at the casino. *Hall*, 39 So. 3d at 983 (¶7). Here, Harris said that she did not know why the victim, Twin, was afraid. She merely related his statement to her that if something

20

happened to him, McKnight "did it." There was no testimony that he was afraid due to any explicit threat by McKnight.

¶53.   While statements that relate to the declarant's present state of mind are admissible under Rule 803(3), statements that merely relate a declarant's belief are not admissible. In *Vann v. State*, 853 S.W.2d 243, 250 (Tex. Ct. App. 1993), the Court of Appeals of Texas held, "[A] statement that a declarant recognizes a reasonable probability that someone is going to be waiting with a gun to shoot the declarant goes beyond the state of mind and enters the realm of belief." Thus, it is inadmissible hearsay under Rule 803(3). *Id*.

> [T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition – "I'm scared" – and not belief – "I'm scared because Galkin threatened me." Cohen's witnesses were permitted to relate any direct statements he had made concerning his state of mind *but were prevented only from testifying as to his statements of belief – that he believed that Galkin was threatening him*.

*United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980) (emphasis added); *see also Linehan v. State*, 224 P.3d 126, 131 (Alaska Ct. App. 2010) (finding that "evidence of a murder victim's fear of the accused . . . . is not admissible if its probative value depends on the impermissible inference that, because the victim feared the accused, the accused likely did something in the past or planned to do something in the future to justify the fear").

¶54.   Harris's testimony that Twin had an issue with J.J. and appeared to be afraid is permissible under Rule 803(3). However, we find Twin's statement to Harris that McKnight *might* do something to him is inadmissible hearsay, as it is merely Twin's statement of belief

21

as to a speculative future event. It was not evidence of Twin's existing state of mind.

¶55. However, in *McIntosh v. State*, 917 So. 2d 78, 83 (¶10) (Miss. 2005), the supreme court held that although a circuit court erred in its admission of testimony under Rule 803(3), "the admission of the hearsay statement was harmless error because the properly admitted evidence was sufficient to support a jury verdict." In the present case, McKnight's uncle testified that he saw McKnight chasing the victim, heard gun shots, then saw McKnight walking back to his car with gun in his hand. Hill testified that McKnight threatened Twin with harm and then chased him down and shot him. As there is ample evidence to support the verdict without Harris's statement, we find the admission of the hearsay statement is harmless error.

### B. David Wells

¶56. Wells was questioned as to how he learned the identity of the man he saw running from the SUV. Defense counsel objected on the ground of hearsay. The circuit court heard the following proffered testimony outside the jury's presence:

> Q. How did you learn that the defendant was James McKnight, or that one of the persons you saw was James McKnight?
>
> A. I was standing right there with Terry [Williams] and Candy and I just, you know, [Williams] turned to Candy and told Candy that, "That was my nephew James."

As Williams's statement to Wells occurred within minutes of the incident, the circuit judge concluded that Wells's testimony was admissible as either a present-sense impression or an "excited utterance," both of which are hearsay exceptions. We agree.

¶57. Mississippi Rule of Evidence 803(1) states that a present-sense impression is "[a]

22

statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." An excited utterance under Mississippi Rule of Evidence 803(2) is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." According to Wells, Williams made the statement to him approximately five minutes after Williams saw the men running, heard gunfire, and encountered McKnight, his nephew, who returned to the vehicle with a gun in his hand. Given the brief amount of time between the shooting and Williams's statement to Wells and the other bystanders, we find no abuse of discretion in the circuit court's admission of this testimony as either a present-sense impression or an excited utterance.

C. James "J.J." McKnight Jr.

¶58. At trial, J.J. was asked what he had told police regarding what Hill said to him on or around the day Twin was killed. Defense counsel objected, and a hearing was held outside the presence of the jury. A proffer was made of the following testimony by J.J.:

Q. Did you give [police] some information that was about a phone conversation that occurred on either the day of the murder of Twin or the day after?

A. Yes.

Q. What did you tell them what [Hill] told you happened when Twin was killed?

A. I don't remember word for word what was said, but, like, I had refreshed when you let me listen to it, but basically to the point saying that it was him, my mom[,] and my dad in the truck.

Q. And then what?

23

A.  And then him and Twin was arguing or something, my dad and Twin were arguing, or him, my dad, and Twin were arguing. And then it got just out of hand or something like that and then they took off running and then [Hill] said that we finished it.

. . . .

Q.  Who did you tell the police that [Hill] told you pulled a gun?

A.  My dad.

The State argued that this testimony was admissible under Rule 803(d)(1)(B), which says that a statement is not hearsay if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive[.]"

¶59.  In *Ben v. State*, 95 So. 3d 1236, 1250-52 (¶¶41-47) (Miss. 2012), the supreme court found a witness's testimony that the victim told him the defendant had raped her was admissible under Rule 801(d)(1)(B), because defense counsel, by emphasizing discrepancies in the victim's own testimony, had attempted to show on cross-examination that the victim had fabricated the rape allegation. Similarly, in the present case, Hill was cross-examined by the defense, who continually questioned the veracity of Hill's testimony. Defense counsel asked Hill, "Isn't it true you've told so many statements, you don't know what the truth is?" and, "[W]ith all due respect, how do we know what you're saying today is the truth?" Defense counsel also asked Hill if he shot Twin.

¶60.  Consequently, the circuit court allowed the admission of J.J.'s testimony, concluding:

> I just think we have an identical situation here where the motives of Mr. Hill were questioned with regard to why he gave multiple statements; whether he was lying now or whether he was lying then; whether he was telling the truth

24

now or the truth then; whether he, in fact, was the man who shot [Twin]; and [J.J.'s] testimony recounting the phone conversation seems to rebut any implication by the defense of recent fabrication of Mr. Hill based on a sweetheart deal or trying to cover himself, quite frankly. So . . . the Court is going to allow this gentleman to testify concerning the phone conversation that he had soon after the shooting with Mr. Hill.

Since J.J's statements were admissible to rehabilitate Hill's credibility as a witness under Rule 801(d)(1)(B), we find no abuse of discretion in the circuit court's ruling. This issue is without merit.

### XIV. Whether Mississippi Code Annotated section 97-37-5 is unconstitutional.

¶61. McKnight contends that his indictment for possession of a firearm by a convicted felon was unconstitutional as it is violative of his rights under the Second Amendment of the United States Constitution. Mississippi Code Annotated section 97-37-5(1) states that "[i]t shall be unlawful for any person who has been convicted of a felony under the laws of this state, any other state, or of the United States to possess any firearm[.]"

¶62. In *James v. State*, 731 So. 2d 1135, 1137 (¶9) (Miss. 1999), the supreme court concluded that section 97-37-5 was "constitutional as a reasonable exercise of police power." We further find the case cited by McKnight to support his contention is not applicable to the facts of this case. Accordingly, we find no merit to this assignment of error.

### XV. Whether McKnight's sentences were excessive and constituted cruel and unusual punishment.

¶63. McKnight claims that his two consecutive life sentences constitute cruel and unusual punishment and are disproportionate under the Eighth Amendment of the United States Constitution. McKnight was sentenced as a habitual offender under Mississippi Code

25

Annotated section 99-19-83.

¶64.   The State provided evidence to the circuit judge that McKnight had two prior felonies arising from separate incidents for which he served a year or more in the custody of the MDOC, and one of the felonies was a crime of violence.  Therefore, McKnight was properly sentenced as a habitual offender.  "Our supreme court has consistently held that sentences under the habitual-offender statute do not constitute cruel and unusual punishment." *Cummings v. State*, 29 So. 3d 859, 861 (¶5) (Miss. Ct. App. 2010) (citations omitted). Accordingly, this issue is without merit.

**XVI.   Whether Mississippi Code Annotated section 99-19-83 is unconstitutional.**

¶65.   McKnight argues that he was entitled to a jury trial on the sentencing because his classification as a habitual offender constituted a capital case, as it subjected him to life imprisonment.  He also argues that because the habitual-offender statute carries a life sentence without the possibility for parole or probation, it "is in violation of the United States Constitution[.]"

¶66.   However, McKnight cites no relevant authority to support his argument.  "Failure to cite to relevant authority results in a waiver of the issue on appeal." *Nunnery v. State*, 126 So. 3d 105, 109 (¶14) (Miss. Ct. App. 2013) (quoting *Bennett v. State,* 933 So. 2d 930, 953 (¶86) (Miss. 2006)).

¶67.   Notwithstanding the waiver of the issue, the supreme court has held that it is the province of the circuit judge "to serve as the finder of fact in determining whether the habitual[-]offender part of the indictment is established by the requisite degree of proof."

*Newberry v. State*, 145 So. 3d 652, 662 (¶37) (Miss. 2014) (quoting *Seely v. State*, 415 So. 2d 213, 215 (Miss. 1984)). Moreover, our supreme court has explicitly held that section 99-19-83 "is constitutional as written." *See Baker v. State*, 394 So. 2d 1376, 1379 (Miss. 1981). Therefore, we also find no merit to McKnight's argument.

### XVII. Whether cumulative errors and plain error warrant reversal and a new trial.

¶68. McKnight claims that "[t]he effect of the combined errors in the instant case warrant a JNOV or a new trial." Originating from the doctrine of harmless error, the cumulative-error doctrine "holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Wilson v. State*, 72 So. 3d 1145, 1159-60 (¶42) (Miss. Ct. App. 2011) (quoting *Thompson v. State,* 990 So. 2d 265, 270 (¶12) (Miss. Ct. App. 2008)). In the present case, we have found only one instance of harmless error in the admission of hearsay testimony by Harris. As we found no other errors, we can find no cumulative error that would necessitate a reversal.

¶69. **THE JUDGMENT OF THE CIRCUIT COURT OF PIKE COUNTY OF CONVICTION OF COUNT ONE, MURDER, AND COUNT TWO, POSSESSION OF A FIREARM BY A CONVICTED FELON, AND SENTENCE AS A HABITUAL OFFENDER ON BOTH COUNTS OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PROBATION, PAROLE, OR EARLY RELEASE, WITH THE SENTENCES TO RUN CONSECUTIVELY, AND TO PAY FINES IN THE AMOUNT OF $10,000 ON COUNT ONE, AND $1,000 ON COUNT TWO, ALONG WITH RESTITUTION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.**

27