# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-KA-01105-SCT

*SAVION WINTERS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/01/2024 |
| TRIAL JUDGE: | HON. MICHELLE DEAN EASTERLING |
| TRIAL COURT ATTORNEYS: | LEOGHAIN STRNAD FAIR |
| | COLLEN LEIGH HUDSON |
| | SCOTT WINSTON COLOM |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | STACY L. FERRARO |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: INDIA MARIAH SPRINKLE |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/04/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**SULLIVAN, JUSTICE, FOR THE COURT:**

¶1. Savion Winters was convicted of aggravated assault and attempted armed robbery following a jury trial in the Oktibbeha County Circuit Court. Winters appeals, claiming that his convictions rested on tainted and unreliable eyewitness identification, untrustworthy testimony of codefendants awaiting sentencing, along with a complete lack of physical evidence connecting Winters to the crimes. Therefore, Winters claims, the trial court erred

by denying Winters's motion for a judgment notwithstanding the verdict (JNOV), or, in the alternative, a new trial. Finding no reversible error, we affirm Winters's convictions.

**FACTS**

¶2. Around 11:00 p.m. on April 25, 2022, Zykerious Birchfield[1] was shot in the chest by a masked man who had accompanied Zykirus Johnson to Birchfield's apartment to purchase $10 of marijuana. Birchfield and Johnson worked together at a waste-management plant, and although the two had known each other for three weeks, Birchfield considered Johnson a friend. The shooting left Birchfield paralyzed from the chest down.

¶3. On the morning of the shooting, Johnson skipped work and spent the afternoon smoking "a couple times" with Winters. Winters discussed needing a job, and Johnson offered to help him get a job at the waste-management plant. The two men parted ways after Winters dropped Johnson off "on the west side."

¶4. Johnson and Winters met up again later that evening and began riding around in Winters's "black sedan." Johnson invited his friend Asheem Harris to come hang out with them and texted Harris's address to Winters around 10:00 p.m. that night. Johnson and Winters then drove to Harris's address in Winters's vehicle.

¶5. Harris testified that this was his first time to meet Winters, who introduced himself as "Savo." Harris said the three men first drove to Chandler Park where Harris could get "some weed." They next drove to Brooksville Gardens where Johnson tried to get "some weed." After leaving Brooksville Gardens, the three headed to the 21 Apartments where

---

[1] The trial transcript spells Birchfield as Burchfield throughout; however, the record shows the correct spelling is Birchfield.

Birchfield lived.

¶6.    According to Harris, on the way to the 21 Apartments, Winters began complaining about not having any money and suggested they "mask up and take [Birchfield] down." Harris claimed he wanted no part of Winters's plan.

¶7.    Harris said that when they arrived at the 21 Apartments, Johnson got out of the vehicle and went up to Birchfield's apartment to "get the weed." That "is when Savo went to the trunk and grabbed some little white thing and put it on and went to the door" with a gun in his hand. Harris heard numerous shots fired and took off running. Harris said "the next thing I know [Winters] was shooting at me too."

¶8.    Harris later turned himself in to authorities after hearing he was a suspect in the shooting. Harris said he told authorities that "somebody named Savo" had committed the crime.

¶9.    Harris told the jury that he (Harris) had already pleaded guilty as an accessory to attempted robbery and aggravated assault and had yet to be sentenced. Harris said he had not been promised anything in exchange for his testimony, and he chose to testify because of what had happened to Birchfield.

¶10.    Johnson testified that he and Winters were riding around in Winters's vehicle the night of the shooting when he received a message from Harris to come pick him up. Johnson texted Harris's address to Winters. A record of the text messages that Johnson sent to Winters the night of the shooting was exhibited to the jury. Johnson testified that after picking up Harris, he (Johnson) "was suppose to get some weed from [Birchfield]" and meet

3

a woman who also lived at the 21 Apartments.

¶11. According to Johnson, as the three men were driving to the 21 Apartments, Winters began talking about needing money "because he was going through some things and his girl and stuff." Johnson said they all three "talked about robbing [Birchfield]."

¶12. Johnson said the plan was for him to go up to Birchfield's apartment and get Birchfield to open the door. Winters and Harris were then "suppose to come in behind me."

¶13. Johnson told the jury that he went up to Birchfield's door and, when Birchfield opened the door, Winters told Johnson to "run, run," which according to Johnson is a saying similar to this "is a stick up." At that point, Birchfield said, "y'all for real[?]" Birchfield then reached for his gun and pointed it at them, and Winters began firing shots. Johnson said he panicked when he saw that Birchfield had been shot, and he began rendering aid to Birchfield. He said Birchfield's roommates ran out of their rooms "and caught me," and one of them called 911.

¶14. When authorities arrived at the scene, Johnson told them that Birchfield was his cousin and that he did not know who had shot Birchfield. Johnson testified that a few days later, he had someone contact the authorities to let them know that Winters was the shooter and not him. Johnson told the jury that he was later indicted for attempted robbery and aggravated assault and that he had pleaded guilty to a felony charge related to the shooting.

¶15. Birchfield testified that Johnson had texted him before the shooting asking to purchase $10 worth of marijuana, which Birchfield had agreed to do. Birchfield said that Johnson then texted him to come outside for the transaction, which Birchfield thought sounded suspicious.

4

Birchfield said he would not come outside and told Johnson to come to the door. Johnson came to the door, and Birchfield handed Johnson the marijuana. The two agreed to use Cash App for the transaction. As Birchfield was typing his Cash App address into his phone, a man wearing a ski mask came up, pointed a gun in Birchfield's face, and told Birchfield "to give him everything I got."

¶16. Birchfield described the assailant to the jury as "a stocky dude" and "bald headed" because of the way the ski mask fit his head "perfectly." Birchfield said the assailant's eyes were "distinctive like he wasn't sober or in his right state of mind."

¶17. Birchfield said he initially froze; then, he reached for his "AR rifle" to protect himself. Birchfield next heard shots fired. "A few hit the wall and one hit me in the chest and it came out the left side of my back." Immediately afterwards, the masked man left, and Johnson stayed behind. Birchfield said he knew this was a "set up" because Johnson came "to buy weed and the person who shot me was with him." Birchfield tried to call 911 but "was going unconscious" as he was dialing. Birchfield said one of his roommates called 911 while Johnson held him and put a towel to his chest.

¶18. Birchfield was taken to Oktibbeha County Hospital and was then transported by medivac to Memphis, Tennessee. Three to four days later, Investigator John Davis with Oktibbeha County Sheriff's Office visited Birchfield at the hospital in Memphis. Birchfield told Investigator Davis that he believed what had occurred at the 21 Apartments "was a set up." Investigator Davis asked for the password to Birchfield's phone, which had been taken as evidence from the scene of the shooting. Birchfield provided the password, and

5

Investigator Davis began searching through the phone. Birchfield testified that Investigator Davis told him that the name Savion Winters "was going around" as a person of interest. Birchfield then looked up on his phone Winters's Facebook page and he said "that that was the person" who had shot him. Birchfield described Winters's profile picture as "Black male. Bald head. Stocky looking with a beard."

¶19. Birchfield also testified that he searched through his phone for the messages between him and Johnson on Facebook Messenger just before the shooting. According to Birchfield, Johnson had "unsent every message he sent me."

¶20. Investigator Davis testified that he responded to the scene of the shooting after hearing on the radio that shots had been fired at 21 Apartments. He said the call came out at 11:04 p.m. When Investigator Davis arrived at the scene, he found Birchfield lying on the floor just inside the door to his apartment. While waiting for the paramedics to arrive, Investigator Davis tried to get information from Birchfield about the shooting because he did not think Birchfield was going to survive. Birchfield told Investigator Davis that he "had been set up" and that "his cousin did it," referring to Johnson, who Investigator Davis said was still at the scene.

¶21. After paramedics arrived, Investigator Davis began investigating the scene. He recovered four bullets from the wall inside the apartment, and he located some shell casings just inside the door of the apartment and outside in the breezeway of the apartment.

¶22. Investigator Davis took three cell phones from the scene as evidence, one belonging to Birchfield, one belonging to Johnson, and one that Investigator Davis later learned

6

belonged to Winters. Johnson was carrying Winters's cell phone at the time. Investigator Davis said he determined that the phone belonged to Winters because Winters "came back asking for it." Investigator Davis said they were able to retrieve information from Johnson's cell phone but not Winters's phone because they were unable to get his pass code.

¶23. When interviewing Johnson at the scene, Johnson initially denied any involvement in the shooting and gave a description of two men responsible for the shooting. He said Johnson's description of the two men fit that of Winters and Harris.

¶24. Investigator Davis later obtained Winter's vehicle information and contacted the Mississippi State University Police Department (MSUPD), which has a license-plate reader (LPR) located at a round-about in front of the 21 Apartments. Investigator Davis provided Winters's license tag number to Detective Stephanie Perkins with the MSUPD, who generated a report from the LPR. The report entered into evidence at trial showed Winters's vehicle heading towards the 21 Apartments at 10:54 p.m. on the night of the shooting and then heading away from the 21 Apartments at 11:04 p.m.

¶25. Investigator Davis eventually interviewed Winters, who denied any involvement in the shooting. Winters said he was at the 21 Apartments the night of the shooting but he was driving his girlfriend's gray Corrolla. He said when he arrived at the 21 Apartments, law enforcement was everywhere. When Investigator Davis asked if he owned a vehicle, Winters "said no."

¶26. Winters did not testify at trial and did not put on a defense after the State rested its case. The jury found Winters guilty of aggravated assault and attempted armed robbery.

7

Winters appeals his convictions, arguing that the State's case was based on legally insufficient evidence or was against the weight of the evidence because (1) Birchfield's identification of Winters was improperly influenced by Investigator Davis, (2) Johnson's and Harris's respective testimonies were unreliable and self-serving, and (3) no physical evidence connected Winters to the crimes.

**DISCUSSION**

¶27.    When a defendant challenges the sufficiency of the evidence to support a conviction, this Court determines whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." **Body v. State**, 318 So. 3d 1104, 1108 (Miss. 2021) (internal quotation marks omitted) (quoting **Parish v. State**, 176 So. 3d 781, 785 (Miss. 2015)).  All admissible evidence and reasonable inferences therefrom are viewed in light most favorable to the prosecution.  **Hogan v. State**, 755 So. 2d 1073, 1075 (Miss. 2000) (citing **Rhodes v. State**, 676 So. 2d 275, 281 (Miss. 1996)).

¶28.    When reviewing a challenge to the weight of the evidence, this Court will not disturb the jury's verdict unless it appears to be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." **Willis v. State**, 911 So. 2d 947, 950 (Miss. 2005) (citing **Stewart v. State**, 909 So. 2d 52, 57 (Miss. 2005)).

A.    **Suggestive-Identification Claim**

¶29.    Winters's claim that Birchfield's identification testimony was unreliable and tainted by suggestive influences is barred from review on direct appeal.  Winters asserts the claim

8

for the first time on appeal; he did not seek to suppress any pretrial identification, nor did he object to any identification testimony at trial. Both this Court and the Court of Appeals have consistently held that such claims are barred from review when raised for the first time on appeal.

¶30. In *McQuarter v. State*, 574 So. 2d 685, 687 (Miss. 1990), the defendant asserted for the first time on appeal that a witness's in-court identification of him was tainted because the witness had been unable to identify him until trial. The defendant claimed the witness identified him as the robber because the defendant was the only black male sitting inside the courtroom railing; thus, her identification of him was clearly suggestive and prejudicial. *Id.* at 687. This Court held the issue was not preserved for appeal and did not address it. *Id.* at 687-88. The Court reiterated that "[u]nless timely and specific objection is made to allegedly improper testimony, the objection is deemed waived and may not be raised on appeal." *Id.* at 688 (citing *Singleton v. State*, 518 So. 2d 653 (Miss. 1988); *Parker v. State*, 367 So. 2d 456 (Miss. 1979)).

¶31. In *Smith v. State*, 724 So. 2d 280, 321 (Miss. 1998), the defendant claimed for the first time on appeal that the testimony of several witnesses identifying him, a codefendant, and the car they were riding in was "the product of suggestive influences and otherwise unreliable since no other persons or photographs of other automobiles were presented to the witnesses for comparison purposes . . . ." This Court declined to address the claim because the defendant did not raise the claim in the trial court. *Id.* The Court said: "At no time during any of this referenced testimony did [the defendant] make any objection to the

9

identification procedures involved, nor did he interject any objection at all." *Id.*

¶32. In *Parks v. State*, 103 So. 3d 772, 774 (Miss. Ct. App. 2012), two codefendants claimed for the first time on appeal that the identification of them as the robbers was tainted and therefore impermissible at trial because no pretrial identification was attempted. "Instead, the police simply told the witnesses who the suspects were, and the witnesses just pointed to them at trial." *Id.* Relying on *McQuarter* and *Smith*, the Court of Appeals held that "[b]ecause there was no objection to the identification and no opportunity for the trial court to address the issue, this [c]ourt will not decide this issue on appeal." *Parks*, 103 So. 3d at 775.

¶33. Consistent with *McQuarter* and *Smith*, we will not address Winters's suggestive-identification claim on direct appeal.

### B.    Accomplice Testimony

¶34. Winters argues that Johnson's and Harris's testimonies were inconsistent and contradictory and, therefore, were too unreliable to support Winters's convictions. Winters relies on *Flanagan v. State*, 605 So. 2d 753, 754 (Miss. 1992), in which this Court reiterated the principle that uncorroborated testimony of an alleged accomplice may support a conviction but not if it is contradictory, improbable, and substantially impeached.

¶35. Winters points to Harris's testimony in which Harris said that Winters wanted to do the robbery, that Johnson then set it up, and that he (Harris) did not want to do the robbery. But Johnson gave testimony that all three executed a plan to rob Birchfield. Harris also testified that "12 to 13 shots were fired," but Investigator Davis said that "4 to 6 shots were

10

fired." Winters next points out that Johnson initially told the police that he did not know who did the shooting and that he was Birchfield's cousin. Lastly, Winters posits that "oddly" his phone was found on Johnson at the scene "even though [Johnson] was texting Winters." Winters contends that these inconsistencies are similar to those found in *Feranda v. State*, 267 So. 2d 305, 306 (Miss. 1972), in which this Court reversed the defendant's conviction and remanded for a new trial given the weak and inconsistent testimony of a codefendant that was "almost completely uncorroborated."

¶36.    We find no merit to this issue. As Winters correctly points out, Mississippi has long "espoused the common law rule that an accused may be convicted on the uncorroborated testimony of an accomplice." *Id.* at 307 (citations omitted) (adding that "even slight corroboration will be sufficient to uphold a conviction"). But "to carry the necessary burden of proof for conviction, the testimony of the accomplice must not be unreasonable, improbable, self-contradictory, nor impeached by an unimpeached witness." *Id.* (citations omitted) (saying also "that such uncorroborated testimony should by viewed with great caution and suspicion").

¶37.    While there are some inconsistencies between Harris's and Johnson's respective testimonies, neither testimony is so unreasonable, improbable, or self-contradictory as to create a serious question about whether or not the State sufficiently established Winters's guilt. That was not the case in *Feranda*, 267 So. 2d 305.

¶38.    There, Feranda, a police officer, was indicted as an accessory before the fact to a burglary scheme carried out by two other men who were indicted for a number of burglaries

11

in a subdivision. *Id.* at 306. One of the codefendants testified at Feranda's trial, and the codefendant's testimony was the only testimony connecting Feranda to the crimes. *Id.* The Court found the codefendant's testimony was "full of inconsistencies, overly vague, and almost completely uncorroborated." *Id.* The Court added that even the trial court had found the codefendant's testimony "hardly believable" but decided to send the State's case to the jury nonetheless. *Id.* at 306-07.

¶39. The Court said the "most serious example of self-contradiction" in the codefendant's testimony concerned the two statements the codefendant gave to police after his arrest. *Id.* at 307. The codefendant made no mention of the Feranda in the first statement as being involved in the burglary scheme. *Id.* The codefendant implicated Feranda in the second statement by stating that Ferranda would help the codefendant "if he were apprehended." *Id.* The Court said both statements "failed to involve Feranda in a scheme to burglarize houses in the Pine Hills Subdivision area where the burglary took place." *Id.*

¶40. Here, the State presented corroborative evidence in addition to Harris's and Johnson's testimonies that supports both their claims that Winters was with them immediately before the shooting and that Winters, himself, was involved in the shooting. Johnson's phone records showed that he and Winters were communicating the morning of the shooting and that Winters had picked up Johnson as Johnson had testified. The phone records showed that Johnson had texted Harris's address to Winters around 10:00 p.m. the night of the shooting, supporting both Harris's and Johnson's testimonies that Winters and Johnson had picked up Harris before the shooting. The records also showed that Johnson texted Winters at 11:02

12

p.m., around the time of the shooting saying, "Come bck trap," and again at 11:07 p.m. saying, "I'm coming." The LPR report showed Winters's vehicle traveling toward the 21 Apartments minutes before gunshots were reported at the apartments, and it showed Winters's vehicle traveling away from the apartments minutes afterwards. Lastly, Winters's phone was located at the scene, which he attempted to get back later while authorities were still at the scene. That the phone was located on Johnson's person at the scene was a detail for the jury to contend with alongside the rest of the evidence presented in the case and along with the weight and credibility of Harris's and Johnson's testimonies.

¶41. This Court has said many times that "the jurors may accept the testimony of some witnesses and refuse that of others and they may accept in part and reject in part the evidence on behalf of the State and on behalf of the accused." *Payton v. State*, 897 So. 2d 921, 937 (Miss. 2003) (quoting *Williams v. State*, 427 So. 2d 100, 104 (Miss. 1983)), *overruled on other grounds by Brown v. State*, 995 So. 2d 698 (Miss. 2008)). The credibility of witnesses is for the finder of fact, not this Court. *Id.* "[W]here the evidence justifies the verdict it must be accepted as having been found worthy of belief . . . ." *Id.* (alteration in original) (quoting *Williams*, 427 So. 2d at 104).

¶42. We find that the evidence presented sufficiently supports each element for aggravated assault and attempted robbery. And we find that the evidence does "not preponderate so heavily against the verdict" that the trial court should have granted a new trial "to avoid sanctioning an unconscionable injustice." *Stone v. State*, 304 So. 3d 601, 605 (Miss. 2020).

### C. Lack of Physical Evidence Tying Winters to the Crimes

¶43. Winters argues that the gun used in the shooting was not found, no DNA was collected, and no other forensic evidence was found. The only other evidence presented was Apple messages between Winters and Johnson from Johnson's phone and a tag reader. Winters acknowledges the LPR report showed Winters's vehicle in a roundabout near the apartments, but the report also showed his vehicle had been through the same roundabout off and on over several weeks, matching his statement given to Investigator Davis. Winters contends that he also told Investigator Davis that he had been at the 21 Apartments but when he arrived, police were everywhere, and he left. Winters submits that this also explains the LPR report.

¶44. We find that physical evidence tied Winters to the crimes of which he was accused; his phone was located at the scene of the crimes, and the LPR report placed his vehicle in the vicinity of the apartments at the time of the crimes. That the LPR report also showed Winters's vehicle in the vicinity of the apartments on numerous other occasions was a detail for the jury's consideration, as was the fact that his phone was found on Johnson's person.

¶45. This Court has said that "[t]he absence of physical evidence does not negate a conviction where there is testimonial evidence." *Lenoir v. State*, 224 So. 3d 85, 94 (Miss. 2017) (internal quotation marks omitted) (quoting *Burleson v. State*, 166 So. 3d 499, 512 (Miss. 2015), *overruled on other grounds by Nevels v. State*, 325 So. 3d 627 (Miss. 2021)). For reasons just explained, Harris's and Johnson's testimonies were not so unreasonable, improbable, or self-contradictory as to create a serious question about whether the State

sufficiently established Winters's guilt. And when considered alongside the State's other evidence, "a rational trier of fact could have found the essential elements" for the crimes of aggravated assault and attempted robbery "beyond a reasonable doubt." *Fagan v. State*, 171 So. 3d 496, 504 (Miss. 2015)). This issue is without merit.

## CONCLUSION

¶46. Winters's convictions for aggravated assault and attempted robbery are affirmed.

¶47. **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., ISHEE, GRIFFIS AND BRANNING, JJ., CONCUR.**